# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF MISSOURI
### WESTERN DIVISION

| | | |
|---|---|---|
| TANYA TEEGARDEN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No.: 4:18-CV-00554-SRB |
| | ) | |
| GOLD CROWN MANAGEMENT, | ) | |
| LLC & NEVIN, DEWAR, | ) | |
| | ) | |
| Defendants. | ) | |

---

## PLAINTIFF'S MEMORANDUM IN OPPOSITTION TO
## DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Respectfully submitted,

**WILLIAMS DIRKS DAMERON LLC**

/s/ Michael A. Williams
Michael A. Williams, MO Bar No. 47538
Amy R. Jackson, MO Bar No. 70144
1100 Main Street, Suite 2600
Kansas City, MO 64105
mwilliams@williamsdirks.com
amy@williamsdirks.com
(o) 816-945-7110
(f)  816-945-7118

**Attorneys for Ms. Teegarden**

i

**<u>TABLE OF CONTENTS</u>**

INTRODUCTION ....................................................................................................... 7

PLAINTIFF'S RESPONSE TO DEFENDANTS' STATEMENT OF FACTS ............................. 9

PLAINTIFF'S STATEMENT OF ADDITIONAL UNCONTROVERTED FACTS ................. 24

ARGUMENT AND AUTHORITY ................................................................................ 39

   I.    STANDARD OF REVIEW .............................................................................. 39

   II.   THE DEWARS HARASSED MS. TEEGARDEN BECAUSE SHE IS AMERICAN AND THE HARASSMENT WAS SUFFICIENTLY SEVERE TO AFFECT THE TERMS & CONDITIONS OF HER EMPLOYMENT IN VIOLATION OF § 1981. .............................. 40

   III.    GOLD CROWN WAS AN ADA EMPLOYER BECAUSE THERE IS EVIDENCE THAT THERE WERE 15 EMPLOYEES DURING THE REQUISITE PERIOD. ................. 41

      1.   2016 Should Be Included because Some of the Discriminatory Incidents Occurred During that Year. ............................................................................................... 42

      2.   Tetyana & Nevin Dewar are on Gold Crown's Payroll & Should be Included in the Count Based on the Supreme Court's Test in Clackamas. ..................................... 43

        A.   Nevin Dewar is Counted because he is Controlled and Supervised by his Father, he appears on the Payroll, & He Lacks Authority within the Organization .......................... 43

        B.   Tetyana Dewar is Counted because she Admits she Does not Have Any Ownership Interest, she has no Influence over Vijay Dewar & Only Covers for Absent Employees on a Part-Time Basis .......................................................................................... 44

3.   Gold Crown, Park, Torries, Gladstone, and Mission are Integrated Enterprises for Purposes of Employee Numerosity ...................................................................... 44

4.   Total Number of Employees for the Enterprise in 2016 is a Range of 17 to 20 ............ 45

5.   The Payroll Records Have Irregularities & Are Unreliable. .......................................... 46

IV.   PLAINTIFF HAS SET FORTH A PRIMA FACIE CLAIM OF DISABILITY HARASSMENT (HOSTILE WORK ENVIRONMENT – COUNT II) .................................. 47

V.   PLAINTIFF WILL PREVAIL ON HER ADA RETALIATION CLAIM BECAUSE SHE REQUESTED A REASONABLE ACCOMMODATION OF PART-TIME WORK, GOLD CROWN NEVER ENGAGED IN THE INTERACTIVE PROCESS AND FIRED HER INSTEAD.  (COUNT III). ..................................................................................................... 51

VI.   MS. TEEGARDEN'S CLAIMS AGAINST NEVIN DEWAR ARE NOT TIME - BARRED & THE DOCTRINE OF RES JUDICATA & COLLATERAL ESTOPPEL DO NOT APPLY. ...................................................................................................................... 53

CONCLUSION ...................................................................................................................... 56

# TABLE OF AUTHORITIES

Cases

Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) .......... 40

Ashcroft v. Iqbal, 556 U.S. 662, 129 S.Ct. 1937, 173 L.Ed. 2d 868 (2009) ................................ 40

Baker v. Stuart Broad. Co., 560 F.2d 389 (8th Cir. 1977) ............................................................ 44

Baska v. Scherzer, 283 Kan. 750, 156 P.3d 617 (2007) ........................................................ 55, 56

Celotex Corp. v. Catrett, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed 265 (1986) ............................. 41

Clackamas Gastroenterology Ass'n., P.C. v. Wells, 538 U.S. 440 (2003) ...................... 10, 13, 43

Crawford v. Runyon, 37 F.3d 1338 (8th Cir. 1994) ...................................................................... 39

Cunningham v. Kansas City Star Co., 995 F.Supp. 1010 (W.D. Mo 1998) ................................. 39

Devine v. Stone, Leyton & Gershman, P.C., 100 F.3d 78 (8th Cir) ............................................. 43

Domino's Pizza, Inc. v. McDonald, 546 U.S. 470 .......................................................................... 41

Duffner v. City of St. Peters, Mo., 930 F.3d 973 (8th Cir. 2019) ................................................. 55

EEOC v. Prod. Fabricators, Inc., 763 F.3d 963 (8th Cir. 2014) ............................................. 47, 51

Ellis v. Houston, 742 F.3d 307 (8th Cir. 2014) ............................................................................. 40

Erickson v. Pardus, 551 U.S. 89, 127 S.Ct. 2197 ........................................................................ 53

Fortino v. Quasar Co., 950 F.2d 389 (7th Cir. 1991) .................................................................... 40

Gilooley v. Mo. Dept. of Health & Senior Serv., 421 F.3d 734 (8th Cir. 2005) .......................... 51

Heisler v. Metro. Council, 339 F.3d 622 (8th Cir. 2003) .............................................................. 51

Hill v. Walker, 737 F.3d 1209 (8th Cir. 2013) .............................................................................. 51

Jarvis v. Potter, 500 F.3d 1113 (8th Cir. 2007) ............................................................................ 52

Jordan v. Jordan, 47 Kan.App.2d 300, 274 P.3d 657 (2012) ....................................................... 55

Kratzer v. Rockwell Collins, Inc., 398 F.3d 1040 (2005) ............................................................. 48

iv

Lenhardt v. Basis Inst. Of Tech., Inc., 55 F.3d 377 (8th Cir. 1995) ............................................. 43

McDonald v. Santa Fe Trail Transp. Co., 427 U.S. 272 (1976) ................................................... 40

McGraw v. Warren County Oil Co., 707 F.2d 990 (8th Cir. 1983)............................................... 43

Minch Family LLP v. Buffalo-Red Driver Watershed Dist., 628 F.3d 960 (8th Cir. 2010) ........ 55

Mole v. Buckhorn Rubber Prod, Inc., 165 F.3d 1212 (8th Cir. 1999).......................................... 47

Oncale v. Sundowner Offshore Serv., Inc., 523 U.S. 75, 118 S.Ct. 998, 140 L.Ed. 2 (1998)..... 48

Plubell v. Merck & Co., Inc., 434 F.3d 1070 (8th Cir. 2006)....................................................... 53

Rhoten v. Dickson, 290 Kan. 92, 223 P.3d 786 (2010) ................................................................ 55

Ridout v. JBS USA, LLC., 716 F3d 1079 (8th Cir. 2013)............................................................ 52

Rogers v. Sugar Tree Prod., 7 F.3d 577 (7th Cir. 1993)............................................................... 43

Rowe v. Hussmann Corp., 381 F.3d 775 (8th Cir.2004) .............................................................. 42

Sandoval v. Am. Bldg. Maint. Indus., Inc., 578 F.3d 787 (8th Cir. 2009) ................. 44, 45, 46, 47

Shaver v. Independent Stave Co., 350 F.3d 716 (8th Cir. 2003) ...................................... 47, 48, 50

Stewart v. Rise, Inc., 791 F.3d 849 (8th Cir.2015) ...................................................................... 39

Stewart, 793 F.3d (citing Tolan) .................................................................................................. 39

Tolan v. Cotton, 134 S. Ct. 1861 (2014)....................................................................................... 39

Walters v. Metro. Educ. Enter., Inc. v. EEOC, 519 U.S. 202, 117 S.Ct. 660......................... 42, 43

Walton v. Edge Medical Prof'l Serv., LLC, 442 F.Supp.2d 731 (W.D.Mo. July 25, 2006) ........ 41

Williams v. Evans, 220 Kan. 394, 552 P.2d 876 (1976)............................................................... 56

Winston v. State Dep't of Social & Rehab. Serv., 274 Kan. 396, 49 P.3d 1274 (2002) .............. 55

Statutes

42 U.S.C. § 12111(5)(A)............................................................................................................... 42

Kan. Stat. § 60-514(b)................................................................................................................... 55

Rules

Fed. Rule Civ. P. 15(c) ................................................................................................... 52

Case 4:18-cv-00554-SRB   Document 145   Filed 02/21/20   Page 6 of 57

**COMES NOW** Plaintiff, Tanya Teegarden ("Ms. Teegarden" or "Plaintiff"), and pursuant to Local Rules 7(c)(2) and 56.1(b)(1)-(2) and offers her Memorandum in Opposition to Defendants' Motion for Summary Judgment, and states:

## INTRODUCTION

Vijay Dewar has been in the apartment rental business for decades. At all relevant times, he owned four apartment complexes in the Kansas City area including, The Park Apartments a/k/a 79 Metcalf, in Overland Park; Prospect Studios, in Gladstone; Mission Road Studios, in Kansas City, Kansas; and Torries Chase a/k/a Villas at Mur-Len, in Olathe. Employees were frequently moved around to the various apartment complexes to work. No one outside of the Dewar family shared in the profits and losses. Payroll and HR was centralized. A former Gold Crown Management LLC ("Gold Crown") Regional Manager, Debbie Kendrick, stated that from 2013 to 2016, the four apartment complexes were staffed with a range of 15-18 employees. Enough to make this integrated enterprise an employer under the Americans with Disabilities Act ("ADA").

Ms. Teegarden is bipolar and suffers from post-traumatic stress disorder ("PTSD"). In 2015, Ms. Teegarden filled out an application for a job at Prospect Studios and indicated that she was bipolar, had PTSD, and could only work part-time. Ms. Teegarden's completed job application was never produced. Ms. Kendrick interviewed Ms. Teegarden and Ms. Teegarden told Ms. Kendrick that she was disabled and could only work part-time. Ms. Kendrick communicated this information to Vijay Dewar.

Tanya Teegarden was hired as a part-time weekend leasing agent at Prospect Studios, but Vijay Dewar quickly moved her to a full-time position at The Park. Ms. Teegarden told Vijay Dewar and his wife, Tetyana, her life story detailing her childhood abuse and disabilities. Tanya Teegarden experiences mania due to her bipolar disorder and can easily become consumed with

7

her work. Vijay Dewar soon realized this and took advantage of Ms. Teegarden. In 2016, Ms. Teegarden gave the Dewars a doctor's note stating she was limited to part-time work. The Dewars never engaged in the interactive process and Ms. Teegarden continued to work full-time.

The Dewars deny knowledge of Ms. Teegarden's disabilities. Ms. Kendrick contradicted this and also confirmed that Vijay Dewar frequently harassed Ms. Teegarden based on her disabilities. He often yelled at Teegarden, "You are crazy," "You are bipolar," and "You are stupid." Vijay Dewar often told Ms. Kendrick, "You gotta get rid of her [referring to Ms. Teegarden] because she's crazy." Ms. Kendrick also confirmed that Nevin Dewar, Vijay's son, harassed Ms. Teegarden. The harassment was so severe that Ms. Teegarden often said she quit, but Vijay Dewar always lured her back.

The Dewars disclosed Ms. Teegarden's disabilities to other employees. They made derogatory comments to the effect that Ms. Teegarden was not taking her medications. The abuse from the Dewars rose to a new level when Nevin Dewar raised his hands as though he was going to choke Ms. Teegarden. On another occasion, Nevin Dewar pushed a table into Ms. Teegarden and the blow broke two of Ms. Teegarden's finger nails and a plate. Ms. Teegarden sought a protection order against Nevin Dewar, but the protection order was denied after Ms. Teegarden's witnesses did not show. Nevin Dewar had a history of violence. Sue Freeman, an Overland Park Building Inspector, would not visit 79 Metcalf without a police escort due to threats from Nevin Dewar.

Shortly before Ms. Teegarden was terminated from Gold Crown, she emailed David Stelting, a Gold Crown Manager, about working part-time because she could no longer handle all of the stress. Mr. Stelting authored a letter stating that Ms. Teegarden was going to work part-time beginning January 6, 2018. There is a reasonable inference that Vijay Dewar was not aware

of Mr. Stelting's promise and decided to terminate Ms. Teegarden. On January 21, 2018, Vijay

Dewar sent Ms. Teegarden a text that said, "Get the fuck out." When Ms. Teegarden attempted to

return to work, a co-worker told her she was no longer employed there.

**PLAINTIFF'S RESPONSE TO DEFENDANTS' STATEMENT OF FACTS**

1.      Statement of Fact ("SOF") No. 1 is controverted. Plaintiff's Second Amended

Complaint states that Ms. Teegarden was hired as a part-time leasing agent in August 2015. See

Doc. # 85 at ¶ 16. However, the second amended complaint erroneously states that Ms. Teegarden

was hired at 79 Metcalf, instead of Prospect Studios. Dep. of Dec. 14, 2018 of Tanya Teegarden

("Teegarden I"), attached as Ex.1 at 17:1-18:8. Ms. Teegarden worked full-time at 79 Metcalf

until she was terminated on January 8, 2016. Teegarden I, Ex.1 at 18:9-19:2. In April 2016, Vijay

Dewar re-hired Ms. Teegarden to work part-time at Prospect Studios on a temporary basis.

Teegarden I, Ex.1 at 19:25-20:16. Ms. Teegarden never got part-time work and continued with

full-time work until Vijay Dewar sent her a text that said, "Get the fuck out." See text message of

Jan. 21, 2018 from Vijay Dewar to Tanya Teegarden, attached as Ex.2. Ms. Teegarden tried to

return to work, but Tyler Yayley, one of Ms. Teegarden's co-workers, told her she no longer

worked there. Teegarden I, Ex.1 at 24:12-25:3.

2.      Defendants' SOF No. 2 is a legal conclusion for which no response is required. To

the extent a response is required, SOF No. 2 is controverted as immaterial. Whether or not Gold

Crown was registered in the State of Missouri in 2008 has no relevance on the issue of whether

Gold Crown had employees prior to January 2016 or is an employer under the ADA.

3.      Defendants' SOF No. 3 is a legal conclusion for which no response is required.

To the extent a response is required, SOF No. 3 is controverted as immaterial. Whether or not

9

Gold Crown was registered in the State of Kansas in 2016 has no relevance on the issue of whether Gold Crown had employees prior to 2016 or is an employer under the ADA.

4. Defendants' SOF No. 4 is a legal conclusion for which no response is required. To the extent a response is required, SOF No. 4 is controverted to the extent that Defendants seek to create an unreasonable inference that a member cannot be an "employee" for purposes of employee numerosity under the ADA. This is a factual question based on a number of factors. See Clackamas Gastroenterology Ass'n., P.C. v. Wells, 538 U.S. 440, 446 (2003). Nevin Dewar was an employee for purposes of employee numerosity under the ADA because he was controlled and supervised by his father, he lacked authority and influence, and received regular wages. Declaration of Debbie Kendrick ("Kendrick Declaration"), attached as Ex.3 at ¶¶ 5, and 8-12, Dep. of Nevin Dewar, Ex.4 at 23:8-12 and Wage Payment Records for Gold Crown for years 2016-2018, attached as Ex. 5.

5. Defendants' SOF No. 5 is a legal conclusion to which no response is required. To the extent a response is required, SOF No. 5 is controverted to the extent that Defendants seek to create an unreasonable inference that Nevin Dewar cannot be an "employee" for purposes of employee numerosity under the ADA. See Plaintiff's Response to Defendants' SOF No. 4.

6. Defendants' SOF No. 6 is a legal conclusion to which no response is required. To the extent a response is required, SOF No. 6 is controverted to the extent that Defendants seek to create an unreasonable inference that Gold Crown; Park, LLC ("Park"); Torries, LLC ("Torries"), Gladstone 180, LLC ("Gladstone"); and Mission 200, LLC ("Mission") were not joint, consolidated or integrated enterprises for purposes of employee numerosity under the ADA.

7. Controverted to the extent that Defendants seek to create an unreasonable inference that Gold Crown did not control the employees who worked at 79 Metcalf, Mur-Len Villas,

Prospect Studios or Mission Studios prior to 2016.  See Plaintiff's Response to Defendants' SOF No. 11, infra.

8.      Controverted to the extent that Defendants seek to create an unreasonable inference that Gold Crown did not control employees who worked at 79 Metcalf, Mur-Len Villas, Prospect Studios or Mission Studios prior to 2016.  See Plaintiff's Response to Defendants' SOF No. 11, infra.

9.      Defendants' SOF No. 9 is a legal conclusion as to which no response is required. To the extent a response is required, SOF No. 9 is controverted to the extent that Defendants attempt to create an unreasonable inference that Nevin Dewar and Tetyana Dewar were not employees for purposes of employee numerosity under the ADA.  Vijay Dewar supervised and instructed Nevin Dewar.  Kendrick Declaration, Ex.3 at ¶ 12. In fact, Nevin Dewar said, "My supervisor is always my father.  I might own half the building, I might have put the money in, but my father is still the boss."  Nevin Dewar Dep., Ex.4 at 27:10-27.  Nevin Dewar and Tetyana Dewar lacked authority to make personnel decisions regarding employees.  Kendrick Declaration, Ex.3 at ¶¶ 8 and 11-12.  Dep. of Tetyana Dewar, Ex.6 at 10:14-22, 17:14-18, 21:8-22:7 28:1-9, and 45:20-46:1.  Vijay Dewar always made it known that he was in charge.  Kendrick Declaration, Ex.3 at ¶ 8.  Tetyana Dewar has no ownership in Gold Crown. Dep. of Tetyana Dewar, Ex.6 at 45:25-46:1.

10.      Uncontroverted.

11.      Defendants' SOF No. 11 is a legal conclusion as to which no response is required. To the extent a response is required, SOF No. 11 is controverted to the extent Defendants seek to create an unreasonable inference that Gold Crown was not a joint employer or part of an integrated enterprise for year 2015.  Gold Crown, Park, Torries, Gladstone and Mission should be treated as

11

a single enterprise because no one outside of the Dewar family held an ownership interest in Gold Crown or Park; Torries, Gladstone or Mission. See Plaintiff's Statement of Additional Facts Nos. 1-5, Vijay Dewar Dep., Ex.7 at 11:7-13:8, Nevin Dewar Dep., Ex.4 at 14:21-21:6. Vijay Dewar is the primary manager and person in charge. Kendrick Declaration, Ex.3 at ¶ 8. In fact, Gold Crown, Park, Torries, Gladstone and Mission employees were frequently shuffled around between the various apartment complexes to perform maintenance, apartment management and/or leasing tasks. Kendrick Declaration, Ex. 3 at ¶ 14.

12. Controverted. There is no table of employees attached as an exhibit to Defendants' Motion for Summary Judgment to support Nevin Dewar's conclusory allegation that there was no period of 20 weeks or more in 2017 (or even through December 31, 2018), in which Gold Crown had 15 or more employees. Moreover, even if a table was attached, it would be unreliable. There were numerous irregularities in the wage payment records Defendant Gold Crown produced.

Park, LLC was the only entity wage records were produced from for 2015 and eight weeks were omitted.

Nevin Dewar did not review any records of Park, Torries, Prospect and/or Mission to identify employees and contractors who worked at 79 Metcalf, Mur-Len Villas, Prospect Studios and/or Mission Road Studios for years 2014-2018. Nevin Dewar Corporate Representative Dep., Ex.9 at 38:8-14 and Plaintiff's Notice Duces Tecum to Take a Deposition of a Designated Agent of Defendant Gold Crown Management. Ex. 20.

An individual named "John" did payroll prior to February 15, 2015; however, "John" went out of business and Gold Crown did not review his records. Nevin Dewar Corporate Representative Deposition, Ex.9 at 30:2-25.

The earliest paycheck produced for year 2016 is dated February 5, 2016, some five weeks after the start of the year. See Wage Payment Records for years 2016-2018, attached as Ex.5. Nevin Dewar testified that the only way to count employees is to review the payroll records and some of the dates were not available from the payroll company. Nevin Dewar Corporate Representative Deposition, Ex.9 at 15:1-20.

There were only 8 checks issued to Ms. Teegarden ranging in dates from May 5, 2016 through September 30, 2016. See id. Ms. Teegarden worked for Gold Crown from approximately May 2016 through January 2018. Teegarden I, Ex.1 at 16:22-20:20, 23:24-25:3 and 100:4-7.

There was only one check issued to David Stelting dated August 5, 2016. See Wage Payment Records for years 2016-2018, Ex. 5. Mr. Stelting testified that he worked for Gold Crown in 2016, 2017 and 2018. Dep. of David Stelting attached as Ex.10 at 51:5-11.

Nevin Dewar's conclusory allegation regarding employee numerosity for years 2017 and 2018 is based on incomplete payroll records. Corporate Representative Dep. of Nevin Dewar, Ex.9 at 16:9-18:20 and 19:2-18.

There were no payments issued to Charles Dudding, who began work for Gold Crown in December 2018, in the 2018 records produced by Gold Crown. See Charles Dudding Declaration, ¶ 4. See Wage Payment Records for years 2016-2018, attached as Ex.12. Mr. Dudding is a named Plaintiff in an FLSA action against Gold Crown. See Complaint, Nichole Hankins & Charles Dudding, Individually & On Behalf of a Class of Similarly Situated, v. Gold Crown Management, LLC., No. 4:19-cv-00630-BP, U.S. Dist. W.D. Mo., Doc. #1.

There were no payments issued to Marcus Kenyon in the 2018 records Gold Crown produced. Mr. Kenyon started around the same time that Charles Dudding did. See Charles Dudding Declaration, ¶ 6-7.

There are numerous employees who contend that they were not paid their wages by Gold Crown during the same time period at issue. See Complaint, Nichole Hankins & Charles Dudding, Individually & On Behalf of a Class of Similarly Situated, v. Gold Crown Management, LLC., No. 4:19-cv-00630-BP, U.S. Dist. W.D. Mo., Doc. #1.

Further, Debbie Kendrick performed some payroll functions and acquired knowledge regarding the number of employees who worked for Gold Crown, Park, Torries, Gladstone and Mission. See Kendrick Declaration, Ex. at ¶¶ 4 and 13-15. 79 Metcalf was regularly staffed with 3 managers, 3-4 maintenance workers, 2-3 cleaning employees and 1-2 groundskeepers. See id. at ¶ 16. Prospect Studios was regularly staffed with 1 manager and 1 maintenance employee. See id. at ¶ 17. Mission Road Studios was regularly staffed with 1 manager and 1 maintenance employee. See id. at ¶ 18. Villas of Mur-Len was regularly staffed with 1 manager and 1 maintenance employee. See id. at ¶ 19. There were also individuals at the apartment complexes who were hired for weekend positions. See Teegarden I, 16:24-17:12 and Teegarden II. 272:3-12, 278:5-7 and

320:8-12. Moreover, on a weekly basis, Nevin Dewar brought in workers he found on Craigslist to perform various construction projects in the individual apartments and the apartment buildings. See Kendrick Declaration, at ¶ 20. Many of those workers were fired by Nevin Dewar for the stated reason that their work was "defective" and they were not paid (and would not be included in the pay records). See id. at ¶ 21.

Charles Dudding began work for Gold Crown in 2018 and worked at 79 Metcalf and later Prospect Studios. See Dudding Declaration, Ex.12 at ¶ 4. 79 Metcalf was regularly staffed with 3 managers plus Nevin Dewar, 3-6 maintenance workers, 1-2 groundskeepers and 1-2 cleaning personnel. See id. at ¶ 5. See id. at ¶ 6. Numerous individuals were hired to do "make ready" work, which entailed getting apartments ready for rental after the tenants moved out. There were even some overnight crews who did this work. See id. at ¶ 6.

Gold Crown's purported wage records are also unreliable because Gold Crown has a history of altering documents to avoid liability. Kendrick Declaration at ¶ 42. Vijay Dewar required Debbie Kendrick to work on a project in which she changed the rental amounts in the computer system so Gold Crown could avoid tax liability. See id. at ¶¶ 41-42. Vijay Dewar later instructed Ms. Kendrick to go back into the computer system and increase the rental amounts to reflect what the tenants were charged. See id. at ¶ 42.

13. Controverted as misleading. An absence of any probable cause findings by the Equal Employment Opportunity Commission, the Kansas Human Rights Commission or the Missouri Commission on Human Rights is not indicative of a discriminatory-free workplace. Vijay Dewar and Nevin Dewar frequently stated that Americans were "stupid" and "lazy." Kendrick Declaration, Ex.3 at ¶¶ 37-40. They also called Debbie Kendrick "handicapped" and "too old to do the job." See id. at ¶ 48. Vijay Dewar frequently stated that Tanya Teegarden was

14

"crazy" and "bipolar." See id. at ¶ 31. Vijay Dewar yelled insults at Ms. Teegarden, including, "You are crazy," "You are stupid," and "You are bipolar." See id. at ¶ 33. On at least one occasion, Vijay Dewar called Tanya Teegarden a "schizophrenic bitch." See id. at ¶ 34, Teegarden I, Ex.1 at 157:19-22. The Dewars also discussed Ms. Teegarden's medications with others and commented that employees should not talk to Ms. Teegarden because "she's not on her meds today" or "the meds must not be working today." Dep. of Tanya Teegarden of Oct. 17, 2019, ("Teegarden II"), attached as Ex.11 at 290:21:291:5. Nevin Dewar called Ms. Teegarden a "fucking bitch" several times. Teegarden I, Ex.1 at 141:15-17. Vijay Dewar told Taiwan, an African-American employee, that he was a "nigger" and that he needed to go back to the "fucking ghetto" where he belonged. Teegarden II, Ex.11 at 333:8-14. Vijay Dewar was known to call African-Americans "fucking niggers." Teegarden I, Ex.1 at 155:21-156:7. He called Hispanics "wetbacks" and "Mexicans." Teegarden I, Ex.1 at 155:21-156:6.

14. Controverted as immaterial. Ms. Teegarden's disability discrimination claim is not barred because she maintained her employment after being denied a reasonable accommodation. Ms. Teegarden kept her job at Gold Crown because she expected to be paid the large commission she was owed. Teegarden II, Ex.11 at 253:11-21. While Ms. Teegarden wanted to protect the interests of the tenants, she could also not control her work habits due to the mania she experienced. Vijay Dewar gave Ms. Teegarden a lot of work because he was aware of this fact. Teegarden I, Ex.1 at 155:10-17 and 155:20-25.

15. Controverted to the extent that Ms. Teegarden did not request a reasonable accommodation in the form of part-time work. Ms. Kendrick interviewed Ms. Teegarden in August 2015. Kendrick Declaration, Ex.3 at ¶ 22. During the interview, Ms. Teegarden told Ms. Kendrick she was disabled and could only accept part-time work. Id. at ¶ 23. Although Ms.

Kendrick told Vijay Dewar that Ms. Teegarden was disabled and needed part-time work, Ms. Teegarden was moved to a full-time position. Teegarden I, Ex.1 at 17:1-18:8. In 2016 or 2017, Tanya Teegarden gave the Dewars a doctor's note regarding the reasonable accommodation of part-time work. Teegarden I, Ex.1 at 174:9-21 and 175:20-176:1. Ms. Teegarden eventually told Mr. Stelting that she could no longer work full-time due to the stress. See id. at 176:23-177:5 and Teegarden II, Ex.11 at 329:8-12. Mr. Stelting authored a letter regarding the fact that Ms. Teegarden was promised part-time work. See undated letter from David Stelting regarding part-time work. Ex. 13.

Ms. Teegarden worked full-time because she wanted to help the tenants, but she also worked more than she should have due to the mania she experienced. See id. at 130:21-24, 155:20-25 and 183:19-25.

Ms. Teegarden was threatened with termination each time she took off, even though she needed to be off. Teegarden I, Ex.1 at 174:5-6.

16.     Controverted. The testimony cited by Defendants does not support SOF No. 16 in that there is no testimony that Gold Crown gave Ms. Teegarden regular raises or was the only leasing agent provided her with a transportation benefit. Ms. Teegarden testified she "got raises and [was] demoted, promoted, demoted, back and forth, back and forth." Teegarden II, Ex.11 at 239:17-20. One raise Ms. Teegarden received only lasted two weeks. Id. at 239:25-240:4. Ms. Teegarden did not know what Ms. Kendrick made and Ms. Marshall started at $11.00 an hour, plus an apartment. See id. at 244:13-245:3 and 259:2-8. Ms. Teegarden started at $10.00 an hour and was not provided with an apartment. See Park LLC Wage Record of Tanya Teegarden, Ex. 8. Teegarden I, Ex.1 at 14:4-15:18. Debbie Kendrick was also provided with a company vehicle. Teegarden II, Ex.11 at 259:19-25.

17.     Controverted.  The testimony cited by Defendants does not support the allegation that Ms. Teegarden had performance issues that prompted the Dewars to yell at her.  Further, the three employees who suffered the most abuse at the hands of the Dewars were all disabled. Teegarden I, Ex.1 at 130:7-24 and 170:9-18.

18.     Controverted. Ms. Teegarden was threatened with termination each time she took off, even though she needed to be off.  Teegarden I, Ex.1 at 174:5-6.

19.     Controverted.  In 2015, Ms. Kendrick informed Vijay Dewar of Ms. Teegarden's disability and need for part-time work.  Kendrick Declaration, Ex.3 at ¶ 22 - 26.  In 2015, Ms. Teegarden shared her life story with Vijay Dewar and Tetyana Dewar, including her diagnoses. Teegarden II, Ex.11 at 269:23-270:8. In 2016 or 2017, Tanya Teegarden gave the Dewars a doctor's note regarding the reasonable accommodation of part-time work.  Teegarden I, Ex.1 at 174:9-21 and 175:20-176:1.  Ms. Teegarden eventually told Mr. Stelting that she could no longer work full-time and Mr. Stelting authored a letter regarding a promise of part-time work.  See id. at 176:23-177:5, and undated letter from David Stelting regarding part-time work. Ex. 13. Ms. Teegarden was threatened with termination each time she took off, even though she needed to be off.  Teegarden I, Ex.1 at 174:5-6.

Further, Ms. Teegarden was not the only leasing agent provided with a transportation benefit. Teegarden II, Ex.11 at 259:19-25.  Other leasing agents (Patty Marshall) received housing benefits such as an apartment, which Ms. Teegarden did not.  Teegarden I, Ex.1 at 14:4-15:18 and Teegarden II, Ex. 11 at 244:13-245:3 and 259:2-8.

20.     Controverted.  In 2015, Ms. Kendrick told Vijay Dewar that Ms. Teegarden was disabled and needed part-time work. Kendrick Declaration, Ex.3 at ¶ 22 - 26.  That same year, Ms. Teegarden told Tetyana and Vijay Dewar about her diagnoses. Teegarden II at 267:13-15 and

270:2-8. In 2016 or 2017, Tanya Teegarden gave the Dewars a doctor's note regarding the reasonable accommodation of part-time work. Teegarden I, Ex.1 at 174:9-21 and 175:20-176:1. Vijay Dewar harassed Ms. Teegarden about her disability and referred to her as bipolar and stated that they needed to get rid of Ms. Teegarden because she was "crazy." See Kendrick Declaration, Ex.3 at ¶¶ 33 and 35. Vijay Dewar also discussed Ms. Teegarden's medications with other employees and made comments to the effect that Ms. Teegarden's medications were not working or that she was not taking them. Teegarden II, Ex.11 at 290:21:291:5. Ms. Teegarden told Dave Stelting that she needed to go part-time due to the stress and there is a letter documenting a promise of part-time work. undated letter from David Stelting regarding part-time work. Ex. 13. Instead of giving Ms. Teegarden part-time work, Vijay Dewar sent Ms. Teegarden a text that said, "Get the fuck out." See id. at 329:8-12, Text of Jan. 21, 2018 from Vijay Dewar to Tanya Teegarden, Ex. 2.

21. Controverted as misleading. Vijay Dewar knew Ms. Teegarden had PTSD, was bipolar, experienced mania and assigned her tasks he knew she could not refuse because she could not control her work habits. See response to Defendant's SOF Nos. 15 and 20. Ms. Teegarden believed she was denied the commission "[b]ecause they [the Dewars] manipulate and overpower . . . and they bully you." Teegarden I, Ex.1 at 120:4-25. There is a reasonable inference that Vijay Dewar refused to pay Ms. Teegarden the commission because he knew that she could not stand up for herself given her mental deficiencies.

22. Plaintiff responds to the subparts in SOF No. 22 as follows:

(a) Controverted. On January 21, 2018, Vijay Dewar terminated Ms. Teegarden's employment when he sent her a text that said, "Get the fuck out." See text message of Jan. 21, 2018 from Vijay Dewar to Tanya Teegarden, Ex. 2. Ms. Teegarden attempted to return to work,

but Tyler Yayley, one of Ms. Teegarden's co-workers, told her she no longer worked there. Teegarden I, Ex.1 at 16:22-20:20, 23:24-25:3 and 100:4-7. In February or March (not April), Tetyana Dewar asked Ms. Teegarden to come back to work. Teegarden I, Ex.1 at 97:11-14-16. On February 10, 2018, Ms. Teegarden sent the following text message to Tetyana Dewar, "Tetyna I was hoping to do my chk on Mon is that still possible its 38 hrs. I want to come back HOPE David hasn't put BS in their minds cuz he is the BS ALL THE TIME. I JUST WANT TO WORK LET ME KNOW OK." Text message from Tanya Teegarden to Tetyana Dewar, Ex. 14. The Dewars told Ms. Teegarden she had to stop asking for payment of the commission. Teegarden II, at 263:4-17. On February 13, 2018, Gold Crown refused to extend an offer of employment to Tanya Teegarden. See Gold Crown letter of Feb. 13, 2018, Ex.15. On February 13, 2018, Ms. Teegarden sent a text that stated, "This is very upsetting to me." Text message of Feb. 13, 2018 from Tanya Teegarden to Tetyana Dewar, Ex.16.

(b) Controverted. Ms. Teegarden believed she was denied the commission "[b]ecause they [the Dewars] manipulate and overpower . . . and they bully you." Teegarden I, Ex.1 at 120:4-25. There is a reasonable inference that Vijay Dewar refused to pay Ms. Teegarden the commission because he knew that she would not stand up for herself given her mental deficiencies.

(c) Controverted as immaterial. The protected activity Ms. Teegarden engaged in to support her ADA retaliation claim is requesting a reasonable accommodation. See Plaintiff's Response to Defendant's SOF No. 20.

(d) Controverted as immaterial. Ms. Teegarden's disability harassment claim is not barred because she maintained her employment after being denied a reasonable accommodation. Further, there is a reasonable explanation as to why Ms. Teegarden kept her job, even though the

work environment was hostile. Ms. Teegarden thought if she continued to work, she would be paid the large commission she was owed. Teegarden II, Ex.11 at 253:11-21.

(e) Controverted. Vijay Dewar called Ms. Teegarden "bipolar" and frequently stated that they needed to get rid of Ms. Teegarden because she was crazy. See Kendrick Declaration, Ex. 3 at ¶¶ 33 and 35. Ms. Teegarden told Dave Stelting that she needed to go part-time due to the stress, he authored a letter documenting the promise of part-time work, but Vijay Dewar terminated Ms. Teegarden when he told her to "Get the fuck out." See id. at 329:8-12, Undated letter from David Stelting regarding part-time work, Ex. 13. Text of Jan. 21, 2018 from Vijay Dewar to Tanya Teegarden, Ex. 2.

(f) and (g) Controverted as immaterial. The protected activity Ms. Teegarden engaged in to support her ADA retaliation claim is requesting a reasonable accommodation. See Plaintiff's Response to Defendant's SOF No. 20.

(h) Controverted as misleading. Ms. Teegarden testified that she was fired more than once and while she knew that she did not have to return to Gold Crown, she "tried to hold on to my employment so I would be compensated for the commissions that I was promised if I would complete these goals." Teegarden II, Ex. 11 at 238:10-11 and 253:11-17. Further, Ms. Teegarden requested an accommodation of part-time work. See Response to Defendant's SOF No. 20. Ms. Teegarden told Dave Stelting that she needed to go part-time due to the stress, he acknowledged receipt of the accommodation request and promised part-time work. Vijay Dewar terminated Ms. Teegarden instead. See id. at 329:8-12. Undated letter from David Stelting regarding part-time work, Ex. 13. Text of Jan. 21, 2018 from Vijay Dewar to Tanya Teegarden, Ex. 2.

(i) Controverted. On January 21, 2018, Vijay Dewar terminated Ms. Teegarden's

employment when he sent her a text that said, "Get the fuck out." Ms. Teegarden returned to work, but Tyler Yayley, one of Ms. Teegarden's co-workers, told her she no longer worked there. See Response to Defendant's SOF No. 1. On February 10, 2018, Ms. Teegarden asked Tetyana Dewar if she could come back to work. See Response to Defendant's SOF No. 22(a). Three days later, Ms. Teegarden received a declination letter. See id.

(j) Uncontroverted.

23.    Controverted. Ms. Teegarden testified that the Dewars, who are of Indian descent, treat Americans differently than people of their own race and Kendrick agreed. Teegarden II, Ex. 11 at 227:3-5 and Kendrick Declaration, Ex. 3 at ¶¶ 37-40. Ms. Teegarden also believed she was denied the commission based on her disability. Teegarden I, Ex. 1 at 120:4-25. There is a reasonable inference that Vijay Dewar did not think that Tanya Teegarden would stand up for herself based on her mental deficiencies and that Tanya Teegarden could not control her work habits due to her mania. See Plaintiff's Response to Defendants' SOF Nos. 15 and 20.

24.    Controverted. Vijay Dewar, who was born in India, exhibited an animus towards Americans, including Tanya Teegarden. Kendrick Declaration, Ex. 3 at ¶¶ 37 and 39-40. He often stated that Americans were "stupid" and "lazy." Ms. Teegarden believed that the Dewars treated "American people different than they do other races; other than their own race specifically." Teegarden II, Ex. 11 at 227:3-5.

25.    Uncontroverted.

26.    Controverted. The testimony cited is misstated. Ms. Teegarden answered "Yeah" when asked if she believed she was denied a commission based on her disability. Teegarden I, Ex. 1 at 121:5-10. Ms. Teegarden believed she was denied the commission "[b]ecause they [the Dewars] manipulate and overpower . . . and they bully you." Teegarden I, Ex. 1 at 120:4-25.

21

Further, Vijay Dewar knew Ms. Teegarden had PTSD, was bipolar and experienced mania. See response to Defendant's SOF Nos. 15 and 20. There is also reasonable inference that Vijay Dewar refused to pay Ms. Teegarden the commission because he knew that she could not stand up for herself given her mental deficiencies.

27.     Defendants' SOF No. 27 and subparts (a) and (b) are uncontroverted.

28.     Controverted. Vijay Dewar frequently stated that Tanya Teegarden was "crazy" and "bipolar." See Plaintiff's Response to Defendants' SOF No. 13. Vijay Dewar yelled insults at Ms. Teegarden, including, "You are crazy," "You are stupid," and "You are bipolar." See id. On at least one occasion, Vijay Dewar called Tanya Teegarden a "schizophrenic bitch." See id. The Dewars also discussed Ms. Teegarden's disabilities with others and commented that employees should not talk to Ms. Teegarden because "she's not on her meds today" or "the meds must not be working today." See id. Nevin Dewar called Ms. Teegarden a "fucking bitch" numerous times. See id. The three employees who suffered the most abuse at the hands of the Dewars were all disabled. See Response to Defendants' SOF No. 17. Although Ms. Teegarden was fired more than once, she returned to work because she hoped she would finally be paid the commission. See Plaintiff's Response to Defendants' SOF No. 22(h).

29.     Controverted. See Response to Defendants' SOF No. 28.

30.     Controverted as misleading. Ms. Teegarden answered Supplemental Interrogatory No. 2 that she informed David Stelting and Vijay Dewar that she quit in the morning hours of January 19, 2018 because she was mad; however, she returned to work that afternoon and continued her employment. See Ex. J to Defendants' Motion for Summary Judgment. Vijay Dewar yelled at Tanya Teegarden so much that in response, Tanya Teegarden frequently stated she quit. Somehow, Vijay Dewar always convinced Tanya Teegarden to resume her employment.

Kendrick Declaration, Ex. 3 at ¶ 36. Vijay Dewar knew Ms. Teegarden still worked at Gold

Crown. See Jan. 18, 2018 text messages between Vijay Dewar and Ms. Teegarden, Ex. 17. The

text of January 21, 2018 from Vijay Dewar to Tanya Teegarden speaks for itself. See text of Jan.

21, 2018 from Vijay Dewar to Tanya Teegarden, Ex. 2.

31.     Controverted as immaterial. Ms. Teegarden's ADA retaliation claim is based on

the fact that she was terminated after she requested a reasonable accommodation. See Response

to Defendant's SOF No. 20.

32.     Uncontroverted.

33.     Controverted in part. Uncontroverted to the extent that the Order of Protection

was denied. Controverted to the extent that Defendants seek to create an unreasonable inference

that the civil protection action was without merit. None of Ms. Teegarden's witnesses showed

up for the hearing. Teegarden II, Ex. 11 at 343:5-12.

34.     Controverted. Ms. Teegarden's Original Pro Se Complaint of July 23, 2018 states:

E.   Write a short and plain statement of FACTS that support your claim. Do not make
     legal arguments. You must include the following information: What happened to you?

Ms. Teegarden answered, in part, "I was pushed by Nevin in the office. He broke my

personal belongings and two nails." Original Complaint, Ex. 18 at 7.

        If more than one claim is asserted, number each claim and write a short and plain
statement of each claim in a separate paragraph. Attach additional pages if needed.

Ms. Teegarden answered, "On Dec. 20, 2017, I was attached physically and mentally

abused by Nevin Dewar @ 16645 W. 139th St., Olathe, Kansas @ 1 pm."

Ms. Teegarden's Amended Pro Se Complaint of August 10, 2018 states:

**III.  Statement of Claim.**

        If more than one claim is asserted, number each claim and write a short and plain
statement of each claim in a separate paragraph. Attach additional pages if needed.

23

Ms. Teegarden answered, "Dec. 20th I was attached by both owners @ 2 property locations."  Amended Complaint, Ex. 19 at 12.

## PLAINTIFF'S STATEMENT OF ADDITIONAL UNCONTROVERTED FACTS

***Gold Crown, Park, Torries, Gladstone & Mission Are an Integrated Enterprise & the Employees are Added for Employee Numerosity Purposes under the ADA.***

1.      No one outside of the Dewar family has an ownership or upper management interest in Gold Crown, Park, Torries, Prospect, or Gladstone.  Vijay Dewar Dep., Ex. 7 at 11:14-15, 11:5-11, 12:4-5 and12:19-21 and Nevin Dewar Dep., Ex. 4 at 18-25:21:6.  Nevin Dewar Corporate Representative Dep., Ex. 9 at 8:24-9:19.

2.      In 2016, 2017, and 2018, Gold Crown operated Metcalf 79, Villas of Mur-Len, Mission Road Studios, and Prospect Studios.  Nevin Dewar Dep., Ex. 4 at 22:5-10. The only business conducted on those properties was apartment rental.  Vijay Dewar Dep., Ex. 7 at 12:22-13:21 and 36:2-4.

3.      Park LLC's handbook was revised and the name was changed to Gold Crown Management.  See Teegarden II, Ex. 11 at 244:9-12 and 250:15-24.  One handbook was used for Gold Crown, Park, Torries, Prospect and Mission.  Vijay Dewar Dep., Ex. 7 at 33:19-22.

4.      In 2016, the employees and independent contractors who worked at Metcalf 79, Villas of Mur-Len, Mission Road Studios, and Prospect Studios were absorbed into Gold Crown. Vijay Dewar Dep., Ex. 7 at 13:24-14:8 And 19:23-20:8 and Nevin Dewar Corporate Representative Deposition, Ex.9 at 10:1-7.

5.      Employees (including Tanya Teegarden), were often moved around at the apartment complexes mentioned in Plaintiff's SOF No. 4.  See Kendrick Declaration, Ex. 3 at ¶

14. Teegarden I, Ex. 1 at 16:24-8, 18:5-8, 21:23-25, and 22:13-15 and 32:20-25. Teegarden II, Ex. 11 at 240:19-24. Dudding Declaration, Ex. 12 at ¶ 9.

***The Wage Records Produced by Defendant Gold Crown had Irregularities***

6.      Gold Crown produced a partial year of payroll records for one entity for the year 2015, which was Park, LLC. The payroll period produced began on February 16, 2015 through December 21, 2015. See Wage Payment Records for years 2015, attached as Ex. 8. An individual named "John" did payroll prior to February 15, 2015; however, "John" went out of business and Gold Crown did not review his records. Nevin Dewar Corporate Representative Deposition, Ex. 9 at 30:2-25. There are 35 individuals on Park, LLC's payroll for the partial year of records produced. See id.

7.      Gold Crown produced a partial year of payroll records for one entity for the year 2016, which was Gold Crown Management. The payroll period produced began on February 5, 2016 through December 20, 2016. See Wage Payment Records for years 2016, attached as Ex. 5. There are 80 individuals on Gold Crown Management's payroll for the partial year of records produced. See Wage Payment Records for years 2016, attached as Ex. 5.

8.      Gold Crown produced a partial year of payroll records for one entity for 2017, Gold Crown Management. The payroll period produced began on January 5, 2017 through December 20, 2017. See Wage Payment Records for years 2016, attached as Ex. 5. There are 61 individuals on Gold Crown Management's payroll for the partial year of records produced. See Wage Payment Records for years 2017, attached as Ex. 5.

9.      Gold Crown produced a partial year of payroll records for one entity for 2018, Gold Crown Management. The payroll period produced began on January 5, 2018 through December 20, 2018. See Wage Payment Records for years 2016, attached as Ex. 5. There are 56 individuals

on Gold Crown Management payroll records for the 2018 partial year.  See Wage Payment Records

for years 2018, attached as Ex. 5.

10.     Nevin Dewar did not review any records of Park, Torries Gladstone and/or Mission

to identify employees and contractors who worked at 79 Metcalf, Villas of Mur-Len, Prospect

Studios and/or Mission Road Studios for years 2014-2018.     Nevin Dewar Corporate

Representative Dep., Ex. 9 at 38:8-14 and Plaintiff's Notice Duces Tecum to Take a Deposition of

a Designated Agent of Defendant Gold Crown Management, Ex. 20.

### *The Gold Crown Integrated Enterprise Had 15 or More Employees for at least One Year of Ms. Teegarden's Employment*

11.     From August 2013 through July 2016, 79 Metcalf was staffed with 3 managers, 3-

4 maintenance workers, 2-3 cleaning employees, and 1-2 groundskeepers for a total of 9-12

employees. See Kendrick Declaration, Ex. 3 at ¶ 16.

12.     From August 2013 through July 2016, Prospect Studios was staffed with 1

manager and 1 maintenance employee for a total of 2 employees. See Kendrick Declaration, Ex.

3 at ¶ 17.  Patty Marshall confirmed that Prospect Studios was staffed with two employees.

Patty Marshall Dep., Ex. 21 at 26:3-23.

13.     From August 2013 through July 2016, Mission Road Studios was staffed with 1

manager and 1 maintenance employee for a total of 2 employees. See Kendrick Declaration, Ex.

3 at ¶ 18. Patty Marshall confirmed that two employees were staffed at Mission Road Studios.

Patty Marshall Dep., Ex. 21 at 27:8-13.

14.     From August 2013 through July 2016, Villas of Mur-Len, was staffed with 1

manager and 1 maintenance employee for a total of 2 employees.  See Kendrick Declaration, Ex.

3 at ¶ 19.

15.     On a weekly basis, Nevin Dewar brought in workers he found on Craigslist to perform various construction projects in the individual apartments and the apartment buildings. See Kendrick Declaration, Ex. 3 at ¶ 20.

16.     There were also individuals who were hired for weekend positions at the various apartment complexes. See Teegarden I, Ex. 1 at 16:24-17:12 and Teegarden II, Ex. 11 at 272:3-, 278:5-7 and 320:8-12.

17.     In 2018, 79 Metcalf was regularly staffed with 3 managers plus Nevin Dewar, 3-6 maintenance workers, 1-2 groundskeepers and 1-2 cleaning personnel. See Dudding Declaration, Ex. 12 at ¶ 5. Numerous individuals were hired to do "make ready" work, which entailed getting apartments ready for rental after the tenants moved out. There were even some overnight crews who did this work. See id. at ¶ 6.

18.     In 2018, Prospect Studios was regularly staffed with 1 manager and 1 maintenance person. See Dudding Declaration, Ex. 12 at ¶ 9.

19.     There are numerous employees who contend that they were not paid their wages by Gold Crown during the time period at issue. See Complaint, Nichole Hankins & Charles Dudding, Individually & On Behalf of a Class of Similarly Situated, v. Gold Crown Management, LLC., No. 4:19-cv-00630-BP, U.S. Dist. W.D. Mo., Doc. #1.

20.     There were numerous irregularities in Gold Crown's wage records:

Park LLC was the only entity wage records were produced from for 2015 and eight weeks were omitted. Ex. 8.

Nevin Dewar did not review any records of Park, Torries Prospect and Mission to identify employees and contractors who worked at 79 Metcalf. Villas of Mur-Len, Prospect Studios and Mission Road Studios for years 2014-2018. Nevin Dewar Corporate Representative Dep., Ex. 9 at 38:8-14 and Plaintiff's Notice Duces Tecum to Take a Deposition of a Designated Agent of Defendant Gold Crown Management. Ex. 20.

27

An individual named "John" did payroll prior to February 15, 2015; however, "John" went out of business and Gold Crown did not review his records. Nevin Dewar Corporate Representative Deposition, Ex. 9 at 30:2-25.

Six and a half weeks were omitted for year 2016. See Wage Payment Records for years 2016-2018, attached as Ex. 5. Nevin Dewar testified that the only way to count employees is to review the payroll records and some of the dates were not available from the payroll company. Nevin Dewar Corporate Representative Deposition, Ex. 9 at 15:1-20.

There were only 8 checks issued to Ms. Teegarden ranging in dates from May 5, 2016 through September 30, 2016. See id. Ms. Teegarden worked for Gold Crown from approximately May 2016 through January 2018. See Teegarden I, attached as Ex.1 at 16:22-20:20, 23:24-25:3 and 100:4-7.

There was only one check issued to David Stelting dated August 5, 2016. See Wage Payment Records for years 2016-2018, attached as Ex.5. Mr. Stelting testified that he worked for Gold Crown in 2016, 2017 and 2018. See Dep. of David Stelting, attached as Ex.10 at 51:5-11.

Nevin Dewar's conclusory allegation regarding employee numerosity for years 2017 and 2018 is based on incomplete payroll records. Corporate Representative Dep. of Nevin Dewar, Ex.9 at 16:9-18:20 and 19:2-18.
.
There were no payments issued to Charles Dudding, who began work for Gold Crown in December 2018, in the 2018 records produced by Gold Crown. See Charles Dudding Declaration, Ex. 12 at ¶ 4. See Wage Payment Records for years 2016-2018, attached as Ex. 5. Mr. Dudding is a named Plaintiff in an FLSA action against Gold Crown. See Complaint, Nichole Hankins & Charles Dudding, Individually & On Behalf of a Class of Similarly Situated, v. Gold Crown Management, LLC., No. 4:19-cv-00630-BP, U.S. Dist. W.D. Mo., Doc. #1.

There were no payments issued to Marcus Kenyon in the 2018 payroll records produced by Gold Crown. Mr. Kenyon started around the same time that Charles Dudding did. See Charles Dudding Declaration, Ex. 12 at ¶ 7.

There are no other documents to look at other than the irregular pay records produced because Gold Crown does not maintain a schedule of when individuals are supposed to work. Vijay Dewar Dep., Ex. 7 at 44:21-45:6.

### *Nevin Dewar, Tetyana Dewar & Tanya Teegarden Should be Counted as Employees for Purposes of Employee Numerosity*

21.     Nevin Dewar should be counted as an employee because he received regular wages, was managed and controlled by Vijay Dewar, and did not have full authority to act on behalf of the company. See Wage Payment Records for years 2016-2018, attached as Ex. 5. Dep. of Nevin

Dewar, Ex. 9 at 23:8-12.  See Kendrick Declaration, Ex. 3, at ¶¶ 8-12.  Further, in 2016, Gold Crown paid unemployment taxes on Nevin Dewar.  See Kansas Department of Labor – Employer's Report of Wages paid, Schedule A, Ex. 22.  In fact, Nevin Dewar said, "My supervisor is always my father.  I might own half the building, I might have put the money in, but my father is still the boss."  Nevin Dewar Dep., Ex. 4 at 27:10-27.

22.     Tetyana Dewar should be counted as an employee.  She worked for Gold Crown on a part-time basis, she did not have an ownership interest, she did not share in the profits or losses, she did not perform management functions, and she certainly never told Vijay Dewar what to do.  Dep. of Tetyana Dewar, Ex. 6 at 10:14-22, 17:14-18, 21:8-22:7 28:1-9, and 45:20-46:1, Vijay Dewar Dep. 7 at 39:25-40:1.  Further, in 2016, Gold Crown paid unemployment taxes on Tetyana Dewar.  See Kansas Department of Labor – Employer's Report of Wages paid, Schedule A, Ex. 23.

### David Stelting Should be Counted as An Employee for 2016

23.     In 2016, Dave Stelting was an employee of Gold Crown for at least part of the year because he was paid wages and admitted he could not recall the date he started billing Gold Crown for his time.  See Wage Payment Records for years 2016-2018, attached as Ex. 5. Dep. of Dave Stelting, Ex. 10 at 23:1-10.  Nevin Dewar referred to Dave as an "employee."  Nevin Dewar Corporate Representative Deposition, Ex. 9 at 28:1-5.  In 2016, Gold Crown paid unemployment taxes on Dave Stelting.  See Kansas Department of Labor – Employer's Report of Wages paid, Schedule A, Ex. 24.  Mr. Stelting also used a time clock.  Vijay Dewar Dep., Ex. 7 at 85:24-25.

### Tanya Teegarden Continued her Employee Status When Park Merged into Gold Crown

24.     Tanya Teegarden was an employee of Park in 2015 and received a W-2.  See Tanya Teegarden W-2, Ex. 25.

25.     If an individual was an employee in 2015, they retained their "employee" status when Park merged into Gold Crown Management in 2016.  See Vijay Dewar Dep., Ex. 7 at 21:21-24.     Moreover, in 2016, Gold Crown paid unemployment taxes on Tanya Teegarden.  See Kansas Department of Labor – Employer's Report of Wages paid, Schedule A, Ex.22.

26.     Independent contractors of Gold Crown were not paid through the payroll company.   Vijay Dewar Dep. Ex.7 at 45:19-22.   Nevin Dewar Corporate Representative Deposition, Ex. 9 at 27:15-28:11. In 2015 and 2016, Tanya Teegarden received wages through the payroll company.  See Wage Payment Records for years 2016-2018, attached as Ex. 5.

27.     Tanya Teegarden was given set hours to work.  Teegarden II, Ex.11 at 241:13-25 and Vijay Dewar Dep., Ex. 7 at 58:10-16.  She was instructed regarding the manner in which she performed her work, she was closely supervised, and she was subject to discipline.  Text messages of Dec. 28, 2017 from Vijay Dewar to Tanya Teegarden, Ex. 26. Tanya Teegarden was required to use a time clock and was reprimanded if she forgot:  ***"Like all other employees punch in and out and plus you have been warned over and over many times by me and Nevin and Dave that starting in 2018, rules are strict due to CPA auditing and saying we will pay only what is a punch on the card . . ."***  Text of January 1, 2018 from Vijay Dewar to Tanya Teegarden, Ex.27.  Contractors were not required to time in and out.  Patty Marshall, Ex.21 at 62:24-63:2.  Vijay Dewar viewed Tanya Teegarden as an employee.  See Vijay Dewar Dep., Ex. 7 at 50:14-19 and 58:22-24.

### *Tanya Teegarden is Disabled, She Notified Defendants of her Disabilities & Requested a Reasonable Accommodation in the Form of Part-Time as Early as August 2015*

28.     Tanya Teegarden suffers from bipolar disorder and PTSD was determined to be disabled by the Social Security Administration.  Teegarden II, Ex. 11 at 267:13 and 270:2-8.

29.     In August 2015, Ms. Teegarden completed an employment application that stated she suffered from PTSD and was bipolar and wanted part-time work.  See Teegarden II, Ex. 11 at 267:16-24.  The job application Defendants produced is not the job application Ms. Teegarden completed.  See Teegarden II, Ex. 11 at 268:5-21.

30.     In August 2015, Debbie Kendrick interviewed Tanya Teegarden and Ms. Teegarden told Debbie Kendrick that she needed part-time work due to her disability.  See Kendrick Declaration, Ex. 3 at ¶ 23.   After Ms. Teegarden's interview, Ms. Kendrick told Vijay Dewar that Ms. Teegarden was only interested in part-time work because she was disabled. See Kendrick Declaration, Ex. 3 at ¶ 24.

31.     Although Ms. Teegarden requested part-time work due to her disability, Vijay Dewar quickly moved Ms. Teegarden to a full-time position at 79 Metcalf after three weeks. Teegarden I, Ex. 1 at 17:1-18:8.

32.     In 2015, Tanya Teegarden shared her life story with Vijay Dewar and Tetyana Dewar regarding the abuse from her childhood and told them about her specific diagnoses. Teegarden II, Ex. 11 at 269:23-270:8.

33.     In 2016 or 2017, Tanya Teegarden gave the Dewars a doctor's note regarding the reasonable accommodation of part-time work.  Teegarden I, Ex. 1 at 174:9-21, 175:20-176:1 and Teegarden II, Ex. 11 at 320:8-12.

***Terminated & Rehired***

34.     On or about January 8, 2016, Ms. Teegarden was terminated from her position at The Park.  Teegarden I, Ex. 1 at 18:22-20:11.

35.      In April 2016, Vijay Dewar lured Ms. Teegarden back to work with a promise of a part-time property manager position at Prospect Studios and also promised to help her get her

real estate license.  Teegarden I, Ex. 1 at 18:22-20:11, 126:18-21 and Teegarden II, Ex. 11 at 230:13-21. Tanya Teegarden's Notes, Ex. 28.

36.     Ms. Teegarden's "part-time" position at Prospect Studios morphed into a full-time position after two months.   Teegarden I, Ex.1 at 21:2-19.

37.     After Ms. Teegarden began working for Dewar again, she was paid as an independent contractor, even though she requested to be paid as an employee.  Teegarden I, Ex. 1 at 61:19-24.

### *Disability Harassment Which Created a Hostile Work Environment*

38.     Debbie Kendrick heard Vijay Dewar frequently say that Tanya Teegarden was "crazy" and "bipolar."  Kendrick Declaration, Ex. 3 at ¶ 31.  Vijay Dewar frequently yelled at Tanya Teegarden and said, "You are crazy," "You are stupid," and "You are bipolar." Kendrick Declaration, Ex. 3 at ¶ 33.  On at least one occasion, Vijay Dewar called Tanya Teegarden a "schizophrenic bitch."  Kendrick Declaration, Ex. 3 at ¶ 34.

39.     During Vijay Dewar's deposition he said, "Which side of Tanya is today, we don't know."  Vijay Dewar Dep., Ex. 7 at 87:19-20.

40.     Vijay Dewar told Debbie Kendrick numerous times, "You gotta get rid of her [referring to Tanya Teegarden] because she's crazy."  Kendrick Declaration, Ex. 3 at ¶ 35.

41.     Vijay Dewar yelled at Tanya Teegarden so much that in response, Tanya Teegarden frequently stated she quit.  Somehow, Vijay Dewar always convinced Tanya Teegarden to resume her employment.  Kendrick Declaration, Ex. 3 at ¶ 36.

42.     Nevin Dewar frequently yelled at Tanya Teegarden and belittled her.  Kendrick Declaration, Ex. 3 at ¶ 32.

32

43.     The harassment continued throughout Ms. Teegarden's employment and at one point, Nevin Dewar raised his hands as if she was going to choke Ms. Teegarden and called her a "stupid bitch" and "crazy."  Tanya Teegarden Petition for Order of Protection, Ex. 29 at p.2. and Teegarden I, Ex. 1 at 156:4-158:3.

44.     Vijay Dewar told Tanya Teegarden that she was "hallucinating" with respect to being paid a commission.  See text message of January 19, 2018 from Vijay Dewar to Tanya Teegarden, Ex. 7.

45.     The Dewars also discussed Ms. Teegarden's disabilities with other employees and stated that employees should not talk to Ms. Teegarden because "she's not on her meds today" or "the meds must not be working today."  Teegarden II, Ex. 11 at 290:21:291:5.  The Dewars told Max Harris, who worked at Villas of Mur-Len, that Ms. Teegarden was bipolar, that she was manic, that they didn't know what was wrong with her and that her meds were not working quite right.  Teegarden II, Ex. 11 at 292:20-293:8.  Mr. Stelting told Ms. Teegarden that the Dewars told him that Teegarden was bipolar.  Teegarden II, Ex.11 at 293:21-24.

46.     Nevin Dewar frequently called employees he deemed to be slow "retarded" and this occurred on a frequently basis.  Dudding Declaration, Ex. 12 at ¶ 10.

47.     The three employees who suffered the most abuse at the hands of the Dewars all had disabilities.  Teegarden I, Ex. 1 at 130:7-24 and170:9-18.

48.     Vijay Dewar and Nevin Dewar often yelled at Ms. Kendrick and unnecessarily criticized her work.  Kendrick Declaration, Ex. 3 at ¶ 49.  Vijay Dewar and Nevin Dewar frequently called Ms. Kendrick "fat," "lazy," "handicapped," and "too old to do the job."   Kendrick Declaration, Ex. 3 at ¶ 48.

*Gold Crown Does Not Have a Policy Regarding How to Respond to Workplace Complaints & Does Not Train Employees on Anti-Discrimination*

49.     Gold Crown does not have a policy regarding how to respond to workplace complaints.  Vijay Dewar Dep., Ex. 7 at 40:12-41:9.  Gold Crown does not train employees about anti-discrimination.  See Vijay Dewar Dep., Ex. 7 at 54:16-19.

*Promised a Commission to Rehab & Increase Occupancy at Mur-Len Villas*

50.     Vijay Dewar and Nevin Dewar promised Ms. Teegarden $10,000 if she did pre-sale work to improve Villas of Mur-Len and increase the occupancy rate.  Teegarden II, Ex. 11 at 221:4-16 and 222:16-21.  Tanya Teegarden's Notes, Ex. 31. Ms. Teegarden had contractors repair Villas of Mur-Len and increased the occupancy rate from 34% to 94%.  Teegarden I, Ex.1 at 115:9-116:10.

51.     By December 2017, a buyer had put down earnest money on Mur-Len Villas.

52.     Ms. Teegarden asked the Dewars for her "commission," but she was never paid.

53.     Vijay Dewar was known to tell employees that they could get "bonuses" by doing extra projects, but then many times, he did not pay them.  Kendrick Decl., Ex. 3 at ¶¶ 41-45.

*No Payment for Corporate Leasing Commissions at Mission Road Studios*

54.     The summer of 2017. the Dewars also promised Ms. Teegarden a commission for doing corporate leasing work at Mission Road Studios and she leased units to a company out of Florida.  See Tanya Teegarden's Notes, Ex.32. Teegarden I, Ex. 1 at 204:4-25.

55.     Ms. Teegarden was not paid for completing the corporate leasing work at Mission Road Studios.  See Tanya Teegarden's Notes, Ex. 32. Teegarden I, Ex.1 at 204:4-25 and 203:18-25.

*Nevin Dewar Assaulted Tanya Teegarden*

56.     On December 17, 2017, Nevin Dewar told Ms. Teegarden to return to Mur-Len Villas for a few days because the property was in poor shape and needed to be fixed up for the sale.

57.     On December 20, 2017, Nevin Dewar became engraged at Tanya Teegarden, called her a bitch 8 times and told her to get the fuck out of his office.  Teegarden I, Ex. 1 at 145:15-149:21.

58.     Later that same day, Nevin Dewar shoved a table into Ms. Teegarden and the table broke two of Ms. Teegarden's fingernails and a plate.  Teegarden I, Ex. 1 at 145:15-149:21 and Teegarden II, Ex.11 at 338:12-339:13.

59.     Later that same day, Ms. Teegarden attended a meeting at 79 Metcalf.  When Ms. Teegarden attempted to sit down, Vijay Dewar told her she was not good enough to sit at the table with him and his son and called her a "bipolar schizophrenic pyscho bitch."  Teegarden II, Ex. 11 at 313:12-314:8 and Teegarden I, Ex. 1 at 52:6-9.

60.     Nevin Dewar had a history of violence.  Sue Freeman, an Overland Park Building Inspector, would not visit 79 Metcalf without a police escort due to threats from Nevin Dewar.  Sue Freeman Affidavit, Ex. 33.  Ms. Freeman witnessed one incident where Nevin Dewar banged on a tenant's door and yelled, "Where is she."  See id.  During another intersection, Nevin Dewar drove his car at a high rate of speed towards Ms. Freeman as she walked in the parking lot.  See id.

61.     During Ms. Freeman's numerous visits to 79 Metcalf, she observed that the workplace was hostile and the Dewars retaliated against apartment managers (including Ms. Teegarden) who defended themselves against the emotional abuse. Sue Freeman Affidavit, Ex. 33.

35

### *Americans Are Stupid & Lazy*

62.     Vijay Dewar was born in India and he and Nevin Dewar often spoke to each other in a foreign language.  Kendrick Declaration, Ex.3 at ¶¶ 37 and 39 and Dudding Declaration, Ex. 12 at ¶ 13.  Vijay and Nevin Dewar frequently made comments that Americans were stupid and lazy.  Kendrick Declaration, Ex. 3 at ¶ 39. Ms. Teegarden, an American, believed that Vijay and Nevin Dewar treated Americans differently than those of their own race.  Teegarden II, Ex. 11 at 227:3-5.

### *Black People Don't Pay Their Bills*

63.     Vijay Dewar also instructed his apartment manager at Prospect Studios not to fill vacant apartments with African-Americans because "black people don't pay their bills."  Dudding Declaration, Ex.12 at ¶ 14.

### *Teegarden told Dave Stelting She Couldn't Handle the Stress Anymore & Wanted Part-Time Work After a Part-Time Weekend Position Became Available.*

64.     Tanya Teegarden emailed David Stelting and stated she could no longer handle the stress and requested a reasonable accommodation in the form of part-time work.  Teegarden II, Ex. 11 at 326:10-18.  A part-time weekend position was open and Mr. Stelting authored a letter promising the part-time job.  Teegarden I, Ex. 1 at 176:23-25 and Teegarden II, Ex. 11 at 320:5-12, 326:10-14, 329:8-12 and 336:23-337:3, Undated letter from David Stelting regarding part-time work, Ex. 13.

65.     Vijay Dewar and Nevin Dewar testified that Ms. Teegarden never wanted part-time work.  Vijay Dewar Dep., Ex. 7 at 68:10 and Nevin Dewar Dep., Ex. 4 at 94:21-95:1.  There is a reasonable inference that Vijay Dewar and Nevin Dewar disagreed about giving part-time work to Ms. Teegarden.

### Terminated

66.     On January 21, 2018, Vijay Dewar sent Tanya Teegarden a text that said, "Get the fuck out." See text message of Jan. 21, 2018 from Vijay Dewar to Tanya Teegarden, attached as Ex. 2. On January 25, 2018, Ms. Teegarden attempted to report to work, but she was told by Tyler Yaley that she no longer worked at Gold Crown.  Teegarden II, Ex. 11 at 233:20-234:4.

67.     Gold Crown held Ms. Teegarden's final paycheck for three weeks after she was terminated, and the paycheck was short.  Text of February 10, 2018 from Tanya Teegarden to Tetyana Dewar, Ex. 34. Tanya Teegarden's Notes, Ex.35.

68.     On February 10, 2018, Ms. Teegarden sent the following text message to Tetyana Dewar, "Tetyana I was hoping to do my chk on Mon is that still possible its 38 hrs. I want to come back HOPE David hasn't put BS in their minds cuz he is the BS ALL THE TIME.  I JUST WANT TO WORK LET ME KNOW OK."   Text message from Tanya Teegarden to Tetyana Dewar, Ex 14. The Dewars told Ms. Teegarden she had to stop asking for payment of the commission. Teegarden II, Ex. 11 at 263:4-17.

69.     On February 13, 2018, Gold Crown refused to extend an offer of employment to Tanya Teegarden.  See Gold Crown letter of Feb. 13, 2018, Ex.15. On February 12, 2018, Ms. Teegarden sent a text of the February 13, 2018 letter that stated, "This is very upsetting to me." Text message from Tanya Teegarden to Tetyana Dewar, Ex. 16.

### Tanya Teegarden had a Clean Disciplinary History with Gold Crown

70.     Vijay Dewar never counseled Tanya Teegarden regarding her behavior.  Vijay Dewar Dep., Ex. 7 at 88:22-89:1.  Tanya Teegarden was never disciplined during the time she worked at Gold Crown.  Vijay Dewar Dep., Ex. 7 at 85:19-24.  Patty Marshall never saw Tanya Teegarden get into a disagreement with a tenant.  Patty Marshall Dep., Ex. 21 at 56:19-22.

***The Hostile Work Environment Ms. Teegarden was Subjected to Exacerbated her PTSD & Bipolar Disorders to the Point She Could Not Even Leave Her Home***

71.     The harassment Ms. Teegarden suffered at the hands of the Dewars was so severe that it exacerbated her PTSD and bipolar disorders to the point that after she was terminated, she could not leave her house.  Teegarden I, Ex. 1 at 186:5-20.    Ms. Teegarden sought medical treatment for the abuse from the Dewars. Teegarden Notes, Ex.36.

***Ms. Teegarden's Original & Amended Complaint Included Assault & Battery***

72.     Ms. Teegarden's Original Pro Se Complaint of July 23, 2018 states:

F.   Write a short and plain statement of FACTS that support your claim.  Do not make legal arguments.  You must include the following information:  What happened to you?

Ms. Teegarden answered, in part, "I was pushed by Nevin in the office.  He broke my personal belongings and two nails."  Original Complaint, Ex. 18 at 7.

If more than one claim is asserted, number each claim and write a short and plain statement of each claim in a separate paragraph.  Attach additional pages if needed.

Ms. Teegarden answered, "On Dec. 20, 2017, I was attached physically and mentally abused by Nevin Dewar @ 16645 W. 139th St., Olathe, Kansas @ 1 pm

Ms. Teegarden's Amended Pro Se Complaint of August 10, 2018 states:

**III.  Statement of Claim.**

If more than one claim is asserted, number each claim and write a short and plain statement of each claim in a separate paragraph.  Attach additional pages if needed.

Ms. Teegarden answered, "Dec. 20th I was attached by both owners @ 2 property locations."  Amended Complaint, Ex. 19 at 12.

73.     Steve Mirakian has been Gold Crown's defense counsel since the inception of the litigation.  Docket Sheet, Ex. 37.  Mr. Mirakian is defense counsel for Nevin Dewar.  See id.  After

Ms. Teegarden filed a civil protection action in Johnson County, Kansas, Mr. Mirakian was

defense counsel for Nevin Dewar. See Exhibit M to Defendants' Motion for Summary Judgment.

74.     None of Ms. Teegarden's witnesses appeared for the hearing in the civil protection

action. Teegarden II, Ex. 11 at 343:5-12.

## ARGUMENT AND AUTHORITY

### I.     STANDARD OF REVIEW

"Summary judgment should seldom be used in employment discrimination cases and is

appropriate only in those rare instances where there is no dispute of fact and where there exists

only one conclusion." Cunningham v. Kansas City Star Co., 995 F.Supp. 1010, 1015 (W.D. Mo

1998) (citing Crawford v. Runyon, 37 F.3d 1338, 1341 (8th Cir. 1994). The evidence of the non-

moving party is to be believed, and all justifiable inferences are to be drawn in her favor. See

Tolan v. Cotton, 134 S. Ct. 1861, 1868 (2014). The Eighth Circuit has acknowledged the Supreme

Court's clear message in Tolan and reversed summary judgment for an employer on a hostile work

environment claim. See Stewart v. Rise, Inc., 791 F.3d 849 (8th Cir.2015). The Eighth Circuit

explained the decision in part:

> As an initial matter, we reject summary judgment based on application of the
> Ellerth/Faragher defense in this case. Questions of fact abound as to the dates of
> events and reports. The relationship between the Code of Conduct and the conflict-
> resolution policy, and the meaning and consequences that should be attached to
> Stewart's annual Code of Conduct certifications to Rise. Therefore, although
> Stewart's annual certifications and her failure to pursue a formal written system of
> grievances may well be outcome determinative in the minds of jurors, they are not
> determination as a matter of law.

Stewart, 793 F.3d at 859 (citing Tolan) ("by failing to credit evidence that contradicted some key

factual conclusions, the court improperly weighed the evidence and resolved disputed issues in

favor of the moving party"). The Eighth Circuit reminded the District Courts that "under Tolan v.

Cotton . . . we may not indulge in the discounting or weighing of evidence. . ." Id.

## II. THE DEWARS HARASSED MS. TEEGARDEN BECAUSE SHE IS AMERICAN AND THE HARASSMENT WAS SUFFICIENTLY SEVERE TO AFFECT THE TERMS & CONDITIONS OF HER EMPLOYMENT IN VIOLATION OF § 1981.

In order to state a national origin-based harassment claim under § 1981, Ms. Teegarden must show: 1) she is a member of a protected group, 2) she was subjected to unwelcome harassment, 3) the harassment was based on her American national origin, and 4) the harassment was sufficiently severe and interfered with the terms, conditions and privileges of her employment. See Ellis v. Houston, 742 F.3d 307, 319 (8th Cir. 2014). There is no number of employees minimum for § 1981 claims and no exhaustion requirement.

The prohibitions in Section 1981 apply to American workers. See McDonald v. Santa Fe Trail Transp. Co., 427 U.S. 272, 296 (1976), Fortino v. Quasar Co., 950 F.2d 389, 392 (7th Cir. 1991). Ms. Teegarden is American. (Plaintiff's Response to Defendants' SOF No.24). Vijay Dewar was born in India. (Plaintiff's SOF No 62.). Vijay Dewar and Nevin Dewar exhibited an animus towards Americans, including Ms. Teegarden. (Plaintiff's SOF No. 62). The Dewars often spoke to each other in a foreign language. (Plaintiff's SOF No. 62). They frequently made comments that Americans were "stupid" and "lazy." (Plaintiff's SOF No.62). Ms. Teegarden subjectively believed that the Dewars held an animus towards Americans as did Ms. Kendrick. (Plaintiff's SOF Nos.62 and Plaintiff's Response to Defendant's SOF No. 24). The harassment was sufficiently severe and eventually became physical after Ms. Teegarden was attacked by Nevin Dewar. (Plaintiff's SOF Nos. 43 and 58).

The cases cited by Defendants are not on point. See Ashcroft v. Iqbal, 556 U.S. 662, 129 S.Ct. 1937, 173 L.Ed. 2d 868 (2009) (pleading did not state facts that policy of detaining "high interest" Arab Muslims after 911 was based on discriminatory factors), Anderson v. Liberty

Lobby, Inc., 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (public official was required to set forth facts of actual malice), Celotex Corp. v. Catrett, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed 265 (1986) (widow lacked evidence that Defendant manufactured the asbestos that her deceased husband was exposed to), Domino's Pizza, Inc. v. McDonald, 546 U.S. 470, S. Ct., 1246, 163 L.Ed.2d 1069 (2006) (franchisee's agent did not have an independent right to enforce the franchisee's contract).

Here, Defendants' primary argument is that Mur-Len Villas sold after Ms. Teegarden left Gold Crown and she lost her right to enforce the verbal contract regarding the pre-sale work she did. The idea that Ms. Teegarden's contractual interest died on the day she separated from the company is without merit because the work was already completed. (Plaintiff's SOF Nos.50-55). Moreover, Defendants' reliance on Domino's Pizza is misplaced because the franchisee's agent who brought the § 1981 claim was not a party to the contract. Here, Ms. Teegarden was a party to the contract because she had a verbal agreement with Vijay Dewar to do the pre-sale work. (Plaintiff's SOF Nos.50-55). Ms. Teegarden was also promised a bonus if she leased units to a corporation, which she completed. (Plaintiff's SOF Nos.54-55).

Based on the above, Ms. Teegarden has brought forth evidence (corroborated by another employee), that the Dewars thought that Americans were too "stupid" and "lazy" to enforce their contract rights and it was unnecessary to pay them.

### III. GOLD CROWN WAS AN ADA EMPLOYER BECAUSE THERE IS EVIDENCE THAT THERE WERE 15 EMPLOYEES DURING THE REQUISITE PERIOD.

"[A] liberal construction is to be given to the definition of an employer." See Walton v. Edge Medical Prof'l Serv., LLC, 442 F.Supp.2d 731, 748 (W.D.Mo. July 25, 2006). The ADA defines an employer as an entity with fifteen or more employees for each working day in twenty

41

or more calendar weeks during the current or preceding year.  See 42 U.S.C. § 12111(5)(A).  The payroll method is used to determine the number of employees, which focuses on whether the employer had a relationship with the employee on the day in question and not whether the employee was actually scheduled or paid for that particular day.  See <u>Walters v. Metro. Educ. Enter., Inc. v. EEOC</u>, 519 U.S. 202, 117 S.Ct. 660, 136 ed. 2d 644 (1997).

**1.  <u>2016 Should Be Included because Some of the Discriminatory Incidents Occurred During that Year.</u>**

The first step is to determine what year is at issue.  Defendants contend that the only relevant years are 2017 and 2018. Defendants' faulty reasoning for this is that Plaintiff requested an accommodation in 2018 and was terminated that same year.  However, Defendants ignore the fact that Plaintiff has alleged a hostile work environment which is a continuing action and began in 2016. See <u>Rowe v. Hussmann Corp.</u>, 381 F.3d 775, 782 (8th Cir.2004) ("a hostile work environment is but a single unlawful employment practice").  (Plaintiff's SOF No.35).

Here, Ms. Teegarden resumed her employment with Gold Crown in 2016.  (Plaintiff's SOF No 35).  Vijay Dewar frequently made comments that Ms. Teegarden was "crazy," "bipolar" and called her a schizophrenic bitch. (Plaintiff's SOF Nos. 38 and 40).  Ms. Kendrick corroborated Ms. Teegarden's testimony.  (Plaintiff's SOF Nos.39, 40-41, 45 and 47).   Vijay Dewar called Ms. Teegarden a "schizophrenic bitch."  (Plaintiff's SOF No. 38). Vijay Dewar told Ms. Kendrick numerous times, "You gottta get rid of her [referring to Tanya Teegarden] because she's crazy. (Plaintiff's SOF No. 40).   Since the hostile work environment began in 2016, it is proper to consider 2016 (and 2015, which is the prior year).

## 2. **Tetyana & Nevin Dewar are on Gold Crown's Payroll & Should be Included in the Count Based on the Supreme Court's Test in Clackamas.**

Defendants' next argument regarding employee numerosity is that Tetyana Dewar, Nevin Dewar, and Vijay Dewar cannot be counted as employees for purposes of employee numerosity because they are owners. Plaintiff concedes that Vijay Dewar should not be counted, but disagrees that Tetyana Dewar and Nevin Dewar should be excluded.

As a preliminary matter, under the payroll method, individuals who appear on the employer's payroll are counted. See Walters, 519 U.S. at 206, 117 S.Ct. 660. Whether an alleged owner is excluded from the count depends on the following factors:

> 1) Whether the organization can hire or fire the owner or set rules and regulations of the individual's work, 2) Whether and, if so, to what extent the organization supervises the individual's work, 3) Whether the individual reports to someone higher in the organization, 4) Whether and, if so, to what extent the individual is able to influence the organization, 6) Whether the parties intended that the individual be an employee, as expressed in written agreements or contracts, and 6) Whether the individual shares in the profits, losses, and liabilities of the organization.

Clackamas Gastroenterology Assoc., P.C. v. Wells, 538 U.S. at 449-50.

The cases cited by Defendants were either pre- Walters or not on point. See McGraw v. Warren County Oil Co., 707 F.2d 990 (8th Cir. 1983) (pre-Walters), Devine v. Stone, Leyton & Gershman, P.C., 100 F.3d 78 (8th Cir) (same), Rogers v. Sugar Tree Prod., 7 F.3d 577 (7th Cir. 1993) (issue was whether two corporations owned by the same person were an integrated enterprise), Lenhardt v. Basis Inst. Of Tech., Inc., 55 F.3d 377 (8th Cir. 1995) (issue was whether Title VII and the Missouri Humans Rights Act recognize individual liability).

### A. **Nevin Dewar is Counted because he is Controlled and Supervised by his Father, he appears on the Payroll, & He Lacks Authority within the Organization**

Here, Nevin Dewar is on the payroll for years 2015 - 2018. (Plaintiff's SOF No. 21). Vijay Dewar made it known that he was the sole owner and the person in charge at Gold Crown.

43

(Plaintiff's SOF No.21).  Vijay Dewar managed Nevin Dewar.  (Plaintiff's SOF No.21).  Nevin Dewar did not have much influence on the organization because Vijay Dewar stated that Nevin could not fire employees.  (Plaintiff's SOF No.21).  As such, the factors weigh in favor of finding that Nevin Dewar should be counted as an employee for purposes of employee numerosity.

### B.  Tetyana Dewar is Counted because she Admits she Does not Have Any Ownership Interest, she has no Influence over Vijay Dewar & Only Covers for Absent Employees on a Part-Time Basis

Tetyana Dewar is on the payroll for years 2016 - 2018.  (Plaintiff's SOF No.22).  Tetyana Dewar conceded that she does not have an ownership interest in Gold Crown.  (Plaintiff's SOF No.22).  She does not have influence.  (Plaintiff's SOF No.22).  Tetyana Dewar works part-time and fills in for absent employees. (Plaintiff's SOF No.22).  Tetyana Dewar is not involved in managerial functions.  (Plaintiff's SOF No.22).  As such, the factors weigh in favor of finding that Tetyana Dewar is an employee.

### 3.  Gold Crown, Park, Torries, Gladstone, and Mission are Integrated Enterprises for Purposes of Employee Numerosity

The next issue is whether Gold Crown, Park, Torries, Gladstone and Mission are a single employer for employee numerosity purposes for year 2015.[1]  The factors used to evaluate whether a group of entities are a single employer are:  1) "the degree of interrelations between the operations, 2) the degree to which the entities share common management, 3) the centralized control of labor, and 4) the degree of common ownership or financial control over the entities."  EEOC Compliance Manual § 2-III(B)(1)(a) (iii), <u>Baker v. Stuart Broad. Co.</u>, 560 F.2d 389, 391-92 (8th Cir. 1977), <u>Sandoval v. Am. Bldg. Maint. Indus., Inc</u>., 578 F.3d 787, 796 (8th Cir. 2009).

---

[1] Beginning in 2016, Gold Crown employed all of the individuals who previously worked at the various apartment complexes.  Affidavit of Nevin Dewar at ¶¶ 3-5, Defendants' Ex. D.

44

In the present matter, there is a high degree of interrelations between the operations because all of the entities are in the same type of business, which is apartment rental. (Plaintiff's SOF. No 1-5). No one outside of the Dewar family has an ownership interest. (Plaintiff's SOF No 1.). Vijay Dewar has ultimate control of Gold Crown, Park, Torries, Mission and Gladstone. (Plaintiff's SOF No. 21). There is a centralized control of labor relations, in fact, employees are shuffled around to the various apartment complexes. (Plaintiff's SOF Nos. 1-5).

Based on the above, all of the employees who work at Gold Crown, Park, Torries, Mission and Gladstone should be counted as a single employer for purposes of employee numerosity under the ADA.

### 4.  Total Number of Employees for the Enterprise in 2016 is a Range of 17 to 20

Defendant relies on Nevin Dewar's conclusory affidavit that Gold Crown did not have 15 or more employees between January 1, 2017 and December 31, 2018. (Defendants' Ex. D at ¶¶ 24-25). Nevin Dewar's affidavit does not address the number of employees for 2016. (See id.) Nevin Dewar's affidavit does not include the purported log that he allegedly made after he reviewed the wage records. The wage records were not included.

Debbie Kendrick (who began working for Vijay Dewar in 2013 and left in 2016), was employed as a Regional Manager, worked at various locations, and performed some payroll functions. (Plaintiff's Response to Defendants' SOF No. 12) Ms. Kendrick was familiar with the number of employees staffed at each location. (See id.). During Ms. Kendrick's time with Gold Crown, 79 Metcalf was staffed with 3 managers, 3-4 maintenance workers, 2-3 cleaners and 1-2 groundskeepers, for an approximate range of 9 – 12 employees for Park. (Plaintiff's SOF No.11). The other three apartment complexes were staffed with two employees, a manager and a maintenance worker. (Plaintiff's SOF Nos. 12-14). There were also individuals hired as weekend

staff at the apartment complexes. (Plaintiff's SOF No. 16). Nevin Dewar also brought individuals in on a weekly basis to perform construction projects in the individual apartments and the apartment buildings. (Plaintiff's SOF No. 15). With the addition of Tetyana Dewar and Nevin Dewar, the total range of employees for 2016 is 17 to 20. (Plaintiff's SOF Nos. 21 and 22).

### 5. __The Payroll Records Have Irregularities & Are Unreliable.__

Gold Crown produced a partial year of payroll records for 2016 for the period beginning February 5, 2016 through December 20, 2016. (Plaintiff's SOF 20). Those records reveal that 80 different individuals were on Gold Crown's payroll in 2016. (Plaintiff's SOF 20). It is hard to imagine how Gold Crown could not have employed 15 individuals for twenty weeks in 2016. Having said that, there are irregularities regarding Gold Crown's pay records:

The pay records for 2016 are missing the first six weeks of 2016. (Plaintiff's SOF No.20).

There were only 8 checks issued to Ms. Teegarden ranging in dates from May 5, 2016 through September 30, 2016. Plaintiff's SOF No.20). Ms. Teegarden worked for Gold Crown from approximately May 2016 through January 2018. (See id.). Nevin Dewar testified that the only way to count employees is to review the payroll records and some of the dates were not available from the payroll company. (Plaintiff's SOF No.20).

There was only one check issued to David Stelting dated August 5, 2016. (Plaintiff's SOF No. 20). Mr. Stelting testified that he worked for Gold Crown in 2016, 2017 and 2018. (See id.)

Nevin Dewar's conclusory allegation regarding employee numerosity for years 2017 and 2018 is based on incomplete payroll records. (Plaintiff's SOF No.20).

There is a pending FSLA action against Gold Crown regarding allegations that it did not properly pay employees for all hours worked during the relevant period. (Plaintiff's SOF 20).

There were no payments issued to Charles Dudding in the 2018 wage records produced by Gold Crown. (Plaintiff's SOF No.20)

There were no payments issued to Marcus Kenyon in the 2018 wage records produced by Gold Crown. (Plaintiff's SOF No.20)

Gold Crown has a history of altering documents so as to avoid liability. (Plaintiff's Response to Defendants' SOF No.12). Specifically, Ms. Kendrick was directed by Vijay Dewar

to lower the rent amounts in the computer system so he could challenge Gold Crown's tax liability and then change the rental amounts back. (See id.).

Based on the above, Plaintiff has demonstrated that Gold Crown meets the employee numerosity requirement under the ADA.

## IV. PLAINTIFF HAS SET FORTH A PRIMA FACIE CLAIM OF DISABILITY HARASSMENT (HOSTILE WORK ENVIRONMENT – COUNT II)

### Disability-Based Harassment by Gold Crown Management Created a Hostile Work Environment.

A disability harassment claim (also known as a hostile work environment), is actionable in the Eighth Circuit. See Shaver v. Independent Stave Co., 350 F.3d 716, 719 (8th Cir. 2003) (hostile work environment claim failed because the only harassment complained of was being called a plate head). In order to make a prima facie ADA harassment claim, Ms. Teegarden must show: 1) she is disabled; 2) she was subjected to unwanted harassment; 3) the harassment was based on her disability; and, 4) the harassment was severe enough to alter the terms and conditions of her employment. See id. at 720-721.

Defendants suggest the elements for a disability harassment claim are: "1) the employer knew about the employee's disability; and  (2) the employee requested specific accommodations and assistance for the disability; and (3) the employer did not [sic] good faith efforts to assist the employee in seeking accommodation; and (4) the employee could reasonably have been accommodated but for the employer's lack of good faith; and (5) the employer engaged in objectively severe and pervasive harassment, creating an objectively hostile work environment." Defendants' Suggestions in Support of Summary Judgment, at 6. Defendants cite EEOC v. Prod. Fabricators, Inc., 763 F.3d 963 (8th Cir. 2014) and Mole v. Buckhorn Rubber Prod, Inc., 165 F.3d 1212 (8th Cir. 1999) in support. The cases cited by Defendants are not on point because they did

47

have hostile work environment claims.  <u>Shaver</u> first recognized an ADA hostile work environment claim and correctly states the elements.  See <u>Shaver</u>, 350 F.3d at 719.

 The other caselaw cited by Defendants is not on point either.  <u>Kratzer v. Rockwell Collins, Inc.</u>, 398 F.3d 1040 (2005) (hostile work environment claim failed because employee admitted she did not feel harassed), <u>Oncale v. Sundowner Offshore Serv., Inc.</u>, 523 U.S. 75, 118 S.Ct. 998, 140 L.Ed. 2 201 (1998) (issue was whether Title VII covered same-sex sexual harassment).

### **The Fact that Ms. Teegarden is Disabled is Not in Dispute.**

It is uncontroverted that Ms. Teegarden is bipolar and suffers from PTSD.  (Plaintiff's SOF No. 28).  In fact, the Social Security Administration has determined that Ms. Teegarden is disabled.  (Plaintiff's SOF No. 28).  Defendants do not dispute that Ms. Teegarden is disabled or qualified.  The only element challenged by Defendants is causation.

### **The Unwanted Harassment Ms. Teegarden Complains of is Corroborated by a Former Regional Manager of Defendant & was Based on Ms. Teegarden's Disabilities.**

While Defendants deny they knew about Ms. Teegarden's PTSD and bipolar conditions, there is ample evidence that they did and they harassed Ms. Teegarden based on her disabilities.

Ms. Teegarden wrote on her job application that she was bipolar and PTDS and needed part time work.  (Plaintiff's SOF No. 29);

Debbie Kendrick interviewed Ms. Teegarden and Ms. Teegarden told her she was disabled and needed part-time work.  Ms. Kendrick told Vijay Dewar that Ms. Teegarden was disabled and requested part-time work because of it.  (Plaintiff's SOF No.30);

Mr. Stelting told Ms. Teegarden that the Dewars told him that she was bipolar.  (Plaintiff's SOF No.45);

Debbie Kendrick frequently heard Vijay Dewar say that Tanya Teegarden was "crazy" and "bipolar." (Plaintiff's SOF No.38);

Debbie Kendrick corroborated Ms. Teegarden's testimony that Nevin Dewar frequently yelled at Teegarden and belittled her.  (Plaintiff's SOF No.42-43);

48

Vijay Dewar frequently yelled at Tanya Teegarden and said, "You are crazy," "You are stupid," and "You are bipolar." (Plaintiff's SOF No.38);

On at least one occasion, Debbie Kendrick heard Vijay Dewar call Ms. Teegarden a "schizophrenic bitch." (Plaintiff's SOF No.38);

Vijay Dewar told Debbie Kendrick numerous times, "You gotta get rid of her [referring to Tanya Teegarden] because she's crazy." (Plaintiff's SOF No.40);

During Vijay Dewar's deposition he said, "Which side of Tanya is today, we don't know." (Plaintiff's SOF No.39);

Vijay Dewar sent Ms. Teegarden a text message that stated she was "hallucinating" about being paid a commission. (Plaintiff's SOF No.44);

Nevin Dewar raised his hands to Ms. Teegarden as though he was going to choke her and called her a "stupid bitch" and "crazy." (Plaintiff's SOF No. 43);

Nevin Dewar's harassment of Ms. Teegarden became physical when he pushed a table into her. (Plaintiff's SOF No. 58). Earlier in the day, Mr. Dewar had become enraged with Ms. Teegarden and called her a bitch no less than eight times. (Plaintiff's SOF No. 57);

On one occasion, Vijay Dewar told Ms. Teegarden she was not good enough to sit at a table with him and his son and called her a "bipolar schizophrenic pyscho bitch." (Plaintiff's SOF No. 59).

The Dewars discussed Ms. Teegarden's disabilities with others and commented that employees should not talk to Ms. Teegarden because "she's not on her meds today" or "the meds must not be working today." (Plaintiff's SOF No. 45);

The Dewars told Max Harris, who worked at Mur-Len Villas that Ms. Teegarden was bipolar, that she was manic, that they didn't know what was wrong with her and that her meds were not working quite right. (Plaintiff's SOF No.45);

Debbie Kendrick heard Vijay Dewar yell at Tanya Teegarden so much that in response, Tanya frequently stated she quit. Somehow, Vijay Dewar always convinced Tanya to resume her employment. (Plaintiff's SOF No.41);

The three employees who suffered the most abuse at the hands of the Dewars all had disabilities and included Ms. Teegarden. (Plaintiff's SOF Nos. 47-48) and

On January 21, 2018, Vijay Dewar sent Ms. Teegarden a text message that said, "Get the fuck out" and when Ms. Teegarden tried to return to work a co-worker told her she was not employed there anymore. (Plaintiff's SOF No. 66).

Based on the above, Vijay Dewar and Nevin Dewar were aware of Ms. Teegarden's disabilities. It is also clear that the harassment was disability-based. See Shaver, 350 F.3d at 721 ("[e]ven if one calls a person 'pegleg' because he has a peg leg rather than because he has trouble walking, it is nevertheless the case that the nickname was chosen because the person was disabled").

**The Disability-Based Harassment Ms. Teegarden Complains of was Sufficiently Severe to Alter the Terms & Conditions of Her Employment.**

"In order to be actionable, harassment must be both subjectively hostile or abusive enough to create an objectively hostile or abusive work environment – an environment that a reasonable person would find hostile or abusive. Shaver, 350 F.3d at 721.

Here, the harassment mentioned above was subjectively and objectively hostile. (Plaintiff's SOF Nos. 38-41 and 43). It was continuous and consisted of numerous disability slurs and insults. (See id). Ms. Teegarden also felt physically threatened because Nevin Dewar raised his hands towards her as though he was going to choke her. (Plaintiff's SOF No.43). The abuse became physical after Nevin Dewar pushed a table into Ms. Teegarden and the blow broke two of Ms. Teegarden's nails and one of her plates. (Plaintiff's SOF No.58). Ms. Teegarden sought an order of protection against Nevin Dewar. (Plaintiff's SOF No.73). Debbie Kendrick witnessed the frequent abuse by the Dewars and could not believe that Vijay Dewar managed to convince Ms. Teegarden to continue her employment. (Plaintiff's SOF Nos. 38 and 40-42). Ms. Teegarden was so traumatized from the abuse that she sought medical care for her once-stable mental conditions. (Plaintiff's SOF No.71).

Defendants seek to avoid liability for a hostile work environment on the basis that Ms. Teegarden admitted that the Dewars yelled at everybody. However, Ms. Teegarden made it clear that the three disabled individuals suffered the most abuse. (Plaintiff's SOF No.47). Patty

Marshall's one one-sided affidavit regarding Ms. Teegarden's bad behavior is contradicted by Vijay Dewar's admission that he never counseled or disciplined Ms. Teegarden for her behavior. (Plaintiff's SOF No.70). Ms. Marshall admitted in her deposition that she never heard Ms. Teegarden get into an argument with a tenant. (Plaintiff's SOF No.70). Ms. Marshall is also biased because she is a current employee of Gold Crown and receives a housing benefit. (Plaintiff's Response to Defendants' SOF No. 19).

Based on the above, Plaintiff will prevail on her disability-based hostile work environment claim.

**V.      PLAINTIFF WILL PREVAIL ON HER ADA RETALIATION CLAIM BECAUSE SHE REQUESTED A REASONABLE ACCOMMODATION OF PART-TIME WORK, GOLD CROWN NEVER ENGAGED IN THE INTERACTIVE PROCESS AND FIRED HER INSTEAD.  (COUNT III).**

In order to state an ADA retaliation claim, Ms. Teegarden must set forth facts showing: (1) she engaged in protected activity, (2) she suffered an adverse employment action and (3) there is a causal connection between the two.  See Heisler v. Metro. Council, 339 F.3d 622, 632 (8th Cir. 2003) (district court erred in granting employer's motion for summary judgment when terminated employee requested an accommodation of day shift work).

The cases cited by Defendants are not on point.  See Prod. Fabricators, 763 F.3d at 972 (employee complained about his shoulder and stated he might need surgery), Gilooley v. Mo. Dept. of Health & Senior Serv., 421 F.3d 734 (8th Cir. 2005) (no evidence that Department of Aging employee's suspension was retaliatory because the employee made an unauthorized visit to a client's hospital room and gave the client pepper spray when he knew that she was a known self-mutilator), Hill v. Walker, 737 F.3d 1209 (8th Cir. 2013) (employee who received return to work

letter but refused to return did not establish that her termination was retaliatory because agency was understaffed).

**Ms. Teegarden Engaged in Protected Activity when She Requested Part-Time Work.**

Requesting an accommodation is a protected activity under the ADA. See Jarvis v. Potter, 500 F.3d 1113, 1126 (8th Cir. 2007).

In 2015, Ms. Teegarden told Ms. Kendrick that she was disabled and needed part-time work. (Plaintiff's SOF Nos. 28-30). Ms. Kendrick told Vijay Dewar that Ms. Teegarden was disabled and needed part-time work. (Plaintiff's SOF No.30). In 2016 or 2016, Ms. Teegarden have the Dewars a doctor's note regarding her need for part-time work. (Plaintiff's SOF No.33). Shortly before Ms. Teegarden's termination, she renewed her request for part-time work. (Plaintiff's SOF No.64). Mr. Stelting promised part-time work and the change was supposed to occur on January 6, 2018. (Plaintiff's SOF No.64).

**Adverse Action – Termination**

Ms. Teegarden was not returned to part-time work. (Plaintiff's SOF No.65). On January 21, 2018, Vijay Dewar terminated Ms. Teegarden's employment when he sent her a text that said, "Get the fuck out." (Plaintiff's SOF No.66). When Ms. Teegarden tried to return to work, a co-worker told her that she no longer worked there. (Plaintiff's SOF 66). On February 13, 2018, Gold Crown refused to re-hire Ms. Teegarden. (Plaintiff's SOF Nos. 68-69).

**Defendants' Explanation that Teegarden had Violated Work Rules & Gold Crown Had a Valid Reason for Terminating Her is Pretextual.**

"An employee can demonstrate pretext by showing that it was unlikely an employer would have acted on the basis of the proffered reason." Ridout v. JBS USA, LLC., 716 F3d 1079, 1084 (8th Cir. 2013) (employee had evidence of pretext because he had never been counseled or warned prior to his termination).

52

Defendants contend that, although they did not fire Ms. Teegarden, they had good reason to do so because Ms. Teegarden had failed to comply with work rules regarding timekeeping. Vijay Dewar admitted that he had never counseled or disciplined Ms. Teegarden for her behavior. (Plaintiff's SOF No. 70). Thus, Ms. Teegarden's alleged poor performance is nothing more than a pretext for unlawful discrimination. As such, Ms. Teegarden has shown that Defendants are not entitled to summary judgment on her retaliation claim.

## VI. MS. TEEGARDEN'S CLAIMS AGAINST NEVIN DEWAR ARE NOT TIME - BARRED & THE DOCTRINE OF RES JUDICATA & COLLATERAL ESTOPPEL DO NOT APPLY.

### The Assault & Battery Claim was Raised in Ms. Teegarden's Original & Amended Pro Se Pleadings.

Pro se filings are liberally construed. See Erickson v. Pardus, 551 U.S. 89, 94, 127 S.Ct. 2197, 167 L.Ed.2d (2007). "[A] pro se complaint, however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers." Id. Moreover, an amended pleading that adds a new defendant "relates back" if the new defendant had notice and the claim arose out of the same conduct alleged in the original pleading. Plubell v. Merck & Co., Inc., 434 F.3d 1070, 1071-72 (8th Cir. 2006), see Fed. Rule Civ. P. 15(c).

In the present matter, Ms. Teegarden's **July 23, 2018 Original Complaint** states:

G. Write a short and plain statement of FACTS that support your claim. Do not make legal arguments. You must include the following information: What happened to you?

Ms. Teegarden answered, in part, "I was pushed by Nevin in the office. He broke my personal belongings and two nails." (Plaintiff's SOF No.72).

If more than one claim is asserted, number each claim and write a short and plain statement of each claim in a separate paragraph. Attach additional pages if needed.

53

Ms. Teegarden answered, "On Dec. 20, 2017, I was attached physically and mentally abused by Nevin Dewar @ 16645 W. 139th St., Olathe, Kansas @ 1 pm (Plaintiff's SOF No.72).

Ms. Teegarden's **Amended Pro Se Complaint of August 10, 2018** states:

### III. Statement of Claim.

If more than one claim is asserted, number each claim and write a short and plain statement of each claim in a separate paragraph. Attach additional pages if needed.

Ms. Teegarden answered, "Dec. 20th I was attached by both owners @ 2 property locations." (Plaintiff's SOF No.72).

Here, Ms. Teegarden's Original Complaint of July 23, 2018 (which was filed against Gold Crown) states that Nevin [Dewar] pushed her in the office and broke two of her nails. (Plaintiff's SOF No. 72). The Original Complaint further elaborates on the assault and battery by providing the date (December 20, 2017) and the location of the occurrence (office address). (Plaintiff's SOF No. 72). Since the Original Complaint was filed 7 months after the assault and battery, the assault and battery claims were timely filed. The Amended Complaint of August 10, 2018 states that Ms. Teegarden was attacked by both owners at two locations. Thus, it relates back to the original complaint. (Plaintiff's SOF No.72).

Plaintiff's Second Amended Complaint relates back because it discusses the same occurrence that was raised in the pro se pleadings. (See Doc. # 85). The fact that Plaintiff's counsel added Nevin Dewar as an individual party does not change this result. Any suggestion that Nevin Dewar was not aware of the occurrence mentioned in the pro se pleadings is without merit. (Plaintiff's SOF No. 73). Gold Crown has used the same defense counsel since the inception of the litigation. (Plaintiff's SOF No.73). Nevin Dewar shares defense counsel with Gold Crown. (Plaintiff's SOF No.73). In fact, the same defense counsel also represented Nevin Dewar in the civil protection action in Johnson County, Kansas. (Plaintiff's SOF No. 73).

54

Since the Original Complaint was filed 7 months after the assault and battery, and the amended pleadings all relate back, the assault and battery claims were timely filed.[2] Defendants' arguments against relation back completely ignore the plain language in Ms. Teegarden's pro se pleadings. As such, Ms. Teegarden's assault and battery claim against Nevin Dewar is timely.

**Res Judicata and Collateral Estoppel Do Not Bar the Assault & Battery Claims.**

In order to determine whether res judicata or collateral estoppel bar Ms. Teegarden's assault and battery claims against Nevin Dewar, the Court must look to Kansas law because Kansas rendered the first judgment in the civil protection action. See Duffner v. City of St. Peters, Mo., 930 F.3d 973, 976 (8th Cir. 2019). Plaintiff is not entirely sure why Defendants cite to a case discussing Minnesota law, but Minnesota law is clearly not applicable. See Minch Family LLP v. Buffalo-Red Driver Watershed Dist., 628 F.3d 960 (8th Cir. 2010).

**Res Judicata does Not Bar the Assault & Battery Claims because the Claims are Different than what was Litigated in Johnson County.**

"Res judicata (claim preclusion) prevents re-litigation of previously litigated claims and has four elements: (1) same claim; (2) same parties; (3) claims were or could have been raised; and (4) a final judgment on the merits." Winston v. State Dep't of Social & Rehab. Serv., 274 Kan. 396, 413, 49 P.3d 1274, 1285 (2002). An exception exists if the claims were not fully litigated. Rhoten v. Dickson, 290 Kan. 92, 110, 223 P.3d 786, 799 (2010).

An action for civil protection is based on the threat of future harm to the applicant and there must be a showing of an actual imminent threat by the other party. Jordan v. Jordan, 47 Kan.App.2d 300, 303, 274 P.3d 657, 660 (2012). A battery claim is based on whether there was a past intentional unprivileged touching. See Baska v. Scherzer, 283 Kan. 750, 756, 156 P.3d 617,

---

[2] Plaintiff does not dispute the fact that there is a one -year statute of limitations in Kansas for assault and battery. See Kan. Stat. § 60-514(b).

622 (2007). An assault is a past "intentional threat." See id. Assault and battery do not concern a threat of future harm. See id.

In the Johnson County civil protection matter, the issue was whether Nevin Dewar posed a risk of imminent harm to Tanya Teegarden, not whether he had made contact with her in the past or had intentionally threatened her. The fact that the protection order was denied does not mean that an intentional tort was not committed in the past. As such, the future safety claim sought in the protective action is entirely different from the prior assault and battery at issue.

Further, even if the claims were the same (which they are not), the claims were not fully litigated in the civil protection matter because Ms. Teegarden's witnesses did not show up for hearing. (Plaintiff's SOF No.74). Therefore, the exception to claim preclusion clearly applies.

**Ms. Teegarden is not Collaterally Estopped from Asserting her Assault & Battery Claims because the Assault & Battery Claims Were Not Decided on the Merit.**

Issue preclusion applies when there is: (1) "a prior judgment on the merits which determined the rights and liabilities of the parties on the issue based upon ultimate facts as disclosed by the pleadings and judgment, (2) the parties must be the same or in privity therein and (3) the issue litigated must have been determined and necessary to support the judgment." Williams v. Evans, 220 Kan. 394, 396, 552 P.2d 876, 878 (1976).

Again, the civil protection matter focused on whether Nevin Dewar posed a future risk of harm to Ms. Teegarden, which is an entirely different issue than whether he intentionally threatened her or made an offensive bodily contact with her on December 20, 2017. As such, issue preclusion does not apply.

## CONCLUSION

**WHEREFORE**, and for the foregoing reasons, Plaintiff respectfully moves the Court for an Order denying Defendants' Motion for Summary Judgment on Plaintiff's claims of national

origin and disability harassment (hostile work environment), ADA retaliation, and assault and battery, and for such other and further relief as the Court deems just and proper.

Respectfully submitted,

**WILLIAMS DIRKS DAMERON LLC**


/s/ Michael A. Williams
Michael A. Williams, MO Bar No. 47538
Amy R. Jackson, MO Bar No. 70144
1100 Main Street, Suite 2600
Kansas City, MO 64105
mwilliams@williamsdirks.com
amy@williamsdirks.com
(o) 816-945-7110
(f)  816-945-7118

**Attorneys for Ms. Teegarden**



**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that on this 21st day of February, 2020, the foregoing was electronically filed with the Court which will send notification to all counsel of record.

/s/ Michael A. Williams
Michael A. Williams